**Paul CHU, in his capacity as Executor of the Estate of James Boa–The Chu**

v.

**LEGION OF CHRIST, INCORPORATED, The Legion of Christ Incorporated, and the Legion of Christ North America, Incorporated.**

C.A. No. 12–814L.

United States District Court, D. Rhode Island.

Feb. 26, 2014.

John J. Flanagan, John J. Flanagan, Attorney At Law, Warwick, RI, for Paul

Chu, in his capacity as Executor of the Estate of James Boa–The Chu.

Brenna Anatone Force, Joseph Avanzato, Nicole J. Benjamin, Adler, Pollock & Sheehan, PC, Providence, RI, for Legion of Christ, Incorporated, The Legion of Christ Incorporated, and the Legion of Christ North America, Incorporated.

## ORDER

RONALD R. LAGUEUX, Senior District Judge.

The Report and Recommendation of U.S. Magistrate Judge Patricia A. Sullivan, dated 1/13/14, is hereby accepted and adopted. Therefore, the Defendants' Motion for Summary Judgment is denied.

The parties will consult, and present to the Court, a new schedule for complying with the various sections of the already issued Pretrial Scheduling Order.

It is so Ordered.

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff Paul Chu ("Paul" or "Plaintiff"), in his capacity as executor of the Estate of his father ("Estate"), Dr. James Boa–Teh Chu ("Dr. Chu"), has sued the Legion Of Christ, Incorporated, The Legion Of Christ Incorporated, and The Legion Of Christ North America, Incorporated (collectively, "The Legion"),[1] claiming that it used fraudulent and deceitful tactics, including undue influence, to induce Dr. Chu to designate The Legion as his beneficiary on all of his retirement annuities, which constituted the lion share of his assets at the time of his death. The Legion's motion for summary judgment (ECF No. 30)

challenges Paul's standing to prosecute this suit based on its claim that Dr. Chu's general charitable intent precludes injury to his Estate—it argues that the undisputed facts establish that Dr. Chu would have designated another Catholic charity as beneficiary of his retirement annuities, if not The Legion, so that his Estate is not injured and his executor lacks standing to pursue these claims. The motion does not challenge the merits of the claims; rather, it asks this Court to examine "whether the litigant is entitled to have the court decide the merits of the dispute." *City of Hope Nat'l Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 228 (1st Cir.1998) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). It has been referred to me for report and recommendation. 28 U.S.C. § 636(b)(1)(B).

The undisputed facts establish that Paul, in his capacity as the executor of his father's Estate, is claiming that, during his lifetime, Dr. Chu was the victim of fraud, deceit and undue influence committed by The Legion. Applying well-settled Rhode Island law, such claims survived the death of Dr. Chu, the victim, may be pursued by Paul, acting as Dr. Chu's personal representative and are the property of Dr. Chu's estate after death. Supplementing these legal principles is the additional undisputed fact that, pursuant to the terms of the retirement annuity contracts, the owner's estate is the default beneficiary. Therefore, both as a matter of law and pursuant to the applicable contracts, Dr. Chu's retirement annuities are payable to his Estate if the designation of The Legion as beneficiary is rendered void due to fraud and undue influence. Accordingly, Plaintiff has standing to pursue these survival claims and the extent and nature of

---

**1.** The Legion's motion sets out the correct names of the defendant entities, which are somewhat different from the appellations

used in the First Amended Complaint. The defendants' versions of their names are used throughout this report and recommendation.

Dr. Chu's general charitable intent, whether disputed or not, is legally immaterial. On that basis, I recommend that the motion be denied.

Alternatively, if Dr. Chu's intent is deemed material to his executor's standing, I find that there is sufficient material in the record to establish a genuine dispute regarding whether Dr. Chu would have left some or all of his retirement annuities to his Estate or his son, but for the fraud allegedly committed by The Legion. *See* Fed.R.Civ.P. 56(c). On that alternative ground, I also recommend that the motion be denied.

## I. BACKGROUND

### A. *Facts* [2]

I begin with The Legion and the scandal that enveloped it during the period from 1997 until 2009, the same period when it was actively cultivating Dr. Chu as a donor.

The Legion is a Roman Catholic congregation that was established in 1941 in Mexico by Father Marcial Maciel Degollado, who served as its General Director until 2005. *Dauray v. Estate of Mee*, Nos. PB 10–1195, PB 11–2640, PB 11–2757, 2012 WL 4043292, at *4 (R.I.Super.Ct. Sept. 7, 2012) (hereinafter *"Dauray"*).[3] Public exposure of scandal within The Legion began with an article published in the Hartford Courant in February 1997, which described sexual abuse by Father Maciel of nine young men over a period from the 1940s to the 1960s. *Id.* The Legion denied the allegations but, in 1998, the Vatican initiated an investigation. *Id.* In 2005, Father Maciel retired from The Legion; on May 19, 2006, the Pope released a Communiqué, which revealed that allegations involving Father Maciel had been received by the Congregation for the Doctrine of the Faith since 1998 and that in 2001, then-Cardinal Joseph Ratzinger, later Pope Benedict XVI, had authorized an investigation, which resulted in an invitation

**2.** As indicated in the text, these facts are derived from a variety of sources—many are disputed. Some are taken from the First Amended Complaint (ECF No. 18) ("Complaint"), Defendants' Statement of Undisputed Facts (ECF No. 31) ("DSUF") and Plaintiff's Statement of Disputed Facts (ECF No. 34) ("PSDF"). Some come from the affidavits presented by the parties in connection with this motion: Plaintiff presented the Affidavit of Paul Chu (ECF No. 33–1 at 14) ("P. Chu Aff.") and the Affidavit of Doreen Carter (ECF No. 33–1 at 20) ("D. Carter Aff."), while The Legion submitted the two Declarations of Leigh Ann Baize, the Senior Customer Resolution Manager of TIAA–CREF (ECF Nos. 32, 37) ("Baize Decl. I" and "Baize Decl. II"). Some come from the documents produced in discovery, which were filed under seal as attachments to Plaintiff's opposition to the summary judgment motion ("P. Ex."). The Legion relies on an unauthenticated letter attached to its Statement of Undisputed Facts (ECF No. 31–1) ("Dec. 23, 2001, Letter"). Finally, I refer on the facts regarding The Legion set out in a compre-

hensive opinion from the Rhode Island Superior Court, which addressed a similar claim of fraud and undue influence. *Dauray v. Estate of Mee*, Nos. PB 10–1195, PB 11–2640, PB 11–2757, 2012 WL 4043292, at *4 (R.I.Super.Ct. Sept. 7, 2012).

**3.** In *Dauray*, the court held that, as spiritual adviser to the decedent, The Legion had the burden to prove that her substantial donations were fair, proper and reasonable; it also held that the plaintiff had presented sufficient evidence to establish viable claims of fraud and undue influence. 2012 WL 4043292, at *11, *13, *15. Nevertheless, the court granted summary judgment in favor of The Legion based on the plaintiff's lack of standing because she was a niece with no expectancy of inheritance who had only seen her aunt once in forty-six years; the court held that Rhode Island law would not permit her to prosecute the claims because she was neither the executor nor a "person legally interested in the estate" pursuant to R.I. Gen. Laws § 33–18–17. *Id.* at *8.

to Father Maciel "to a reserved life of penitence and prayer." *Id.* at *5. In 2008, Father Maciel died; following his death, additional revelations came to light, including that he had fathered children and lived with the mother of one of them. *Id.* On May 1, 2010, the Pope issued a new Communiqué, which acknowledged the "very grave and objectively immoral actions of Father Maciel, confirmed by incontrovertible testimonies, [that] in some cases constitute real crimes and manifest a life devoid of scruples and authentic religious meaning." *Id.*

Dr. Chu's story begins in China where he was born on September 26, 1924. He immigrated to the United States where he had a distinguished academic career as a Professor of Mechanical Engineering at Brown University, the State University of New York and Yale University. DSUF ¶ 2. Paul is not only his father's executor, but also his only child and the only heir under Dr. Chu's will. P. Chu Aff. ¶ 1; Complaint ¶ 10. Dr. Chu's beloved wife and Paul's mother, Mary, died in 1993; Dr. Chu never remarried. PSDF ¶ 3. As far as the record discloses, Dr. Chu's only other family consists of a brother and sister, about whom the record reveals almost nothing, and two nieces, Doreen Carter and Miriam Bergeron. DSUF ¶¶ 1, 3; Carter Aff. ¶ 2; P. Chu Aff. ¶ 6. Because Paul was in the seminary studying for the priesthood, Ms. Bergeron cared for Dr.

Chu in her home during an illness in 2008, P. Chu Aff. ¶ 8. Dr. Chu died on November 21, 2009, at the age of 85. DSUF ¶ 2; P. Chu Aff. ¶ 1; Compl. ¶ 12; Answer ¶ 12.

In the latter part of his life, Dr. Chu suffered from mental health issues, as well as increasingly serious physical ailments. P. Chu Aff. ¶¶ 5–8. Beginning some time prior to 2000, symptoms of mental degeneration began to appear, including mental inflexibility, difficulty assimilating new data, mental tics, fixations and obsessions, some of which exhibited through bizarre hoarding and collecting. P. Chu Aff. ¶ 5. By 2000, Dr. Chu himself was expressing concern over his memory; Paul observed serious memory lapses in his father. *Id.* With the deterioration of his physical and mental health, he stopped teaching in 2003. *Id.* By 2004, his capacity to care for himself had become seriously impaired. P. Chu Aff. ¶ 6. In 2007, he had one of several automobile accidents. P. Chu Aff. ¶ 7. Medical records from 2008 and 2009 reflect treatment for dementia. P. Chu Aff. ¶ 8; P. Ex. 13.[4]

Over the course of his academic career, Dr. Chu built up various retirement annuities, all of which were administered by TIAA–CREF. They were of varying sizes; the largest were the annuities funded by Yale University. In all, the annuities collectively had between $1 million to

---

4. Pursuant to the mandate of the Stipulated Protective Order (ECF No. 29) in this matter, Plaintiff's opposition to this motion included the filing of various documents that had been produced in discovery with a motion to seal, which was granted on October 7, 2013. In this report and recommendation, the content of the sealed documents is not mentioned except to the extent that such content is publically discussed by the parties in their affidavits, declarations, briefs or statements of disputed and undisputed facts. Here, for example, the affidavit of Paul Chu, a public document, discusses Dr. Chu's medical condition and refers to certain medical records, which were filed under seal. Only the information placed in the public record by the parties is disclosed; the underlying records remain sealed. *See Goesel v. Boley Int'l (H.K.) Ltd.*, No. 13–2434, 2013 WL 6800977, at *1 (7th Cir. Dec. 26, 2013) ("Documents that affect the disposition of federal litigation are presumptively open to public view.") (quoting *In re Specht*, 622 F.3d 697, 701 (7th Cir.2010)); *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir.1987) (documents material to matters *sub judice* subject to presumption of public access).

$2 million in assets. ECF No. 33 at 6–7, 11; P. Ex. 7A.[5] Pursuant to the annuity contracts, Dr. Chu could designate a beneficiary, a contingent beneficiary or no beneficiary; in the latter event, the contracts made the estate of the owner of the annuity the default beneficiary. Thus, if the designated beneficiary predeceased, and no contingent beneficiary had been named, at the time of the owner's death, the funds would be paid to the owner's estate. *See* Baize Decl. I ¶ 5, Ex. D; Baize Decl. II ¶¶ 5, 6, 8, 10, Exs. B, C, D, G; ECF No. 33 at 8 ("TIAA Contract, part F entitled death benefit, ¶ 40 'naming your beneficiary,' p. 13. 'The death benefit will be paid to your estate . . . if at your death you had never named a beneficiary.' ").[6]

As a young man, Dr. Chu took instruction in Roman Catholic theology and converted; for the balance of his life, he was a devoted Roman Catholic, which he expressed, *inter alia*, through many charitable donations to Catholic charities. Complaint ¶¶ 10, 12–13; P. Chu Aff. ¶ 2. However, until he came under the influence of The Legion in 1997, it is undisputed that his munificence was directed both to his family and to Catholic charities. Thus, from the establishment of the first of the annuities in 1959 through the death of his wife in 1993, Dr. Chu named both family and charities as his beneficiaries and contingent beneficiaries, including his brother, his son, Paul, and Mother Teresa's charity, the Missionaries of Charity (no relationship to The Legion). Baize Decl. I ¶¶ 2–4, Exs. A–C; DSUF ¶¶ 3–4. Shortly after his wife's death in 1993, Dr. Chu made Paul the primary beneficiary on all of his annuities, with Mother Teresa's Missionaries of Charity as the contingent beneficiary. DSUF ¶ 3; PSDF ¶ 3. In 1995, Dr. Chu made the Missionaries of Charity the primary beneficiary on "certain"[7] annuities, leaving Paul as primary beneficiary on others. DSUF ¶ 4; PSDF ¶ 4.

In 1997, Dr. Chu was drawn into the orbit of The Legion; in that year, he "incorporated" into the Regnum Christi Movement, the lay branch of The Legion. P. Chu Aff. ¶ 3. At the same time, he dismissed his Dominican spiritual advisor and took on a spiritual advisor who was "a Legionary." *Id.* By early 1998, he had been targeted by The Legion for cultivation. ECF No. 33 at 5–6; P. Ex. 2 (Notes) at 1.[8] On July 16, 1998, Dr. Chu named The Legion as the sole beneficiary of all his annuities, replacing both Mother Teresa's Missionaries of Charity and his son; he named no contingent beneficiary. DSUF ¶ 5. The beneficiary designation form, which Dr. Chu signed, provided that the annuity death benefit would be paid to his estate if his beneficiary predeceased him, with "estate" defined as "my duly

---

5. *See* n. 4.

6. Plaintiff did not append this portion of the TIAA–CREF annuity contract to his opposition; it is merely quoted in his supporting memorandum. However, The Legion did not object that the cited material cannot be presented as admissible evidence. *See* Fed. R.Civ.P. 56(c)(2). Rather, its memorandum acquiesces in the proposition that Dr. Chu's TIAA–CREF annuity contracts made the owner's estate the default beneficiary. ECF No. 36 at 7 n. 6. Accordingly, I accept this fact as undisputed for purposes of this motion.

7. This fact is disputed in that The Legion asserts that the Missionaries were named on "certain' annuities," while Plaintiff contends it was only one. The dispute is not material. Pertinent and undisputed is that, as of 1995, before the cultivation of Dr. Chu by The Legion began, his intent with respect to disposition of the annuities was a mix of family and charity, with greater emphasis on the former.

8. *See* n. 4.

appointed Executor(s) or Administrator(s)." Baize Decl. I ¶ 5, Ex. D.

Dr. Chu's deep regard for the sanctity of Father Maciel was a significant factor driving his commitment to the Legion. In 1999, soon after replacing family and other charities with The Legion, he told Paul that misgivings about The Legion had been dispelled by his intense belief that "[Father Maciel] is a saint." P. Chu Aff. ¶ 10. After Dr. Chu's death, Paul found documents evidencing that The Legion was fostering this image of Father Maciel in Dr. Chu's mind at the same time that it was aware of the facts being uncovered by the Vatican's investigation. *Id.* At the end of his life, Dr. Chu was frequently visited by representatives of The Legion and, allegedly as a result, clung to his belief in Father's Maciel's innocence. ECF No. 33 at 5; P. Chu ¶ 10; P. Ex 2 (Actions) at 9.[9] The family affidavits establish that Dr. Chu was aggressively targeted by The Legion's fundraisers in a way that made his family uncomfortable. P. Chu Aff. ¶ 9; Carter Aff. ¶¶ 3–4. For example, Doreen Carter avers that she observed fundraising representatives of the Legion visiting him during his period of decline in health in 2008 and 2009 and that the family had "concerns regarding the Legionaries' motivations." Carter Aff. ¶¶ 3–4. Paul's Affidavit echoes the theme: "the consistency of fundraisers as my father's primary contact to the order led my family to some concern regarding the motivations of the Legion's relationship to my father." P. Chu Aff. ¶ 9.

The parties vigorously dispute the depth of Dr. Chu's support for The Legion following his 1997 "incorporation." The Legion contends that, once he made The Legion (and later its affiliate, the National Catholic Register),[10] the only beneficiary of his retirement annuities in July 1998, he never changed his beneficiary, except for a short period in 2001, when he made Mother Teresa's Missionaries of Charity a contingent beneficiary (but removed it in 2003, after which there was no contingent beneficiary). See DSUF ¶¶ 5–8; Baize Decl. I ¶¶ 5–8, Exs. D–G; Baize Decl. II ¶ 3. In rebuttal, Plaintiff claims that, in the second quarter of 2008, there was no beneficiary designated on Dr. Chu's most significant accounts, which meant that they would be paid to Dr. Chu's Estate, an omission that Paul argues may have been intentional. PSDF ¶¶ 5–8; P. Ex. 7(a).[11] He also points out that, in March 2008, the reports of TIAA–CREF list "Estate" as the beneficiary on one of the Yale annuities. PSDF ¶ 6; Baize Decl. II ¶ 11, Ex. D. Further, Plaintiff points to Dr. Chu's mental health as of 2008 and argues that his father lacked the capacity to reinstate The Legion as beneficiary on the affected annuities. PSDF ¶ 12.

Plaintiff's argument regarding the 2008 beneficiary designations is based on TIAA–CREF business records produced in discovery. It is largely contradicted by the second Declaration of Leigh Ann Baize, Senior Customer Resolution Manager; she avers that the 2008 reference to the "Estate" was on a form sent by TIAA–

---

9. *See* n. 4.

10. The parties agree that the National Catholic Register is connected to The Legion but the nature of the relationship is not specified. *See* ECF No. 30 at 5 n. 4; PSDF ¶ 7 (National Catholic Register believed to be owned by The Legion in 2008; the same Legion representative, using different stationary, communicated with TIAA–CREF to obtain surrender of the

annuities to both The Legion and the National Catholic Register after Dr. Chu died). Lacking information regarding the actual relationship, for ease of reference, I use the imprecise term "affiliate" in this report and recommendation.

11. *See* n. 4.

CREF to Dr. Chu, who promptly called and wrote to advise that the beneficiary designation was "incorrect." Baize Decl. II ¶¶ 11–15. However, the Baize Declaration does not directly state that the designation of the "Estate" was the mistake of TIAA–CREF; it also sidesteps Plaintiff's contention that several accounts on the 2008 statement listed no beneficiary, meaning that those annuities would default to the Estate under the annuity contract. Baize Decl. II ¶ 2 (averring only that "[a]t no time did Dr. Chu ever designate his Estate as the beneficiary"). Thus, the Baize Declaration II does not rule out the possibility that Dr. Chu cancelled the beneficiary designation; under the TIAA–CREF annuity contracts, that action would make his Estate the beneficiary, without actually designating it as such.

The parties do not dispute that Dr. Chu's charitable intent directed towards Catholic charities arched over the span of his life and caused him to make numerous contributions. DSUF ¶ 9. As his son described him, "My father was very generous and a devout Catholic. He gave throughout his life to numerous charities, including one he founded." P. Chu Aff. ¶ 2. However, they vigorously dispute whether Dr. Chu's testamentary intent for his retirement annuities was exclusively charitable. The Legion focuses on the fact that, from July 16, 1998, until his death, Dr. Chu consistently named only charities (and not Paul or his Estate); he did not ever name Paul or his Estate, even as a contingent beneficiary. DSUF ¶ 8. The Legion corroborates this proof with the December 23, 2001, Letter, purportedly written by Dr. Chu, ostensibly expressing Dr. Chu's general charitable intent and rationale for excluding Paul as his beneficiary:

> But what can I give to my Beloved besides myself? The only other thing I have is my wealth. I can give all that to Him! I don't worry about Paul, because he has a good head on his shoulder and I know he will manage. Indeed, he can make a good living, if he chooses to. But, if he wishes to live poorly, that is O.K. with me. I know he loves God and that is all I care. He knew that I came to this country with, so to speak, only a shirt on my back. All that I have now came from His goodness to me. I am only returning all of them to Him.

DSUF ¶ 10; Dec. 23, 2001, Letter. Based on this evidence, The Legion contends that the undisputed facts establish that, if The Legion had not been his beneficiary, Dr. Chu would have directed the annuities to another Roman Catholic charity, and never to his son or his Estate. Accordingly, it contends, there are no circumstances under which Plaintiff, either as the Estate or as the sole heir under the will, would have received the monies in Dr. Chu's retirement accounts. DSUF ¶ 12.

Plaintiff counters that Dr. Chu also had a long history of providing for his family, including his son, who was also a teacher and devout Catholic. PSDF ¶ 9. In addition to the business records of TIAA–CREF from 2008 that show no beneficiary and the Estate as beneficiary for certain annuities, as well as the will itself, which makes Paul his sole heir, Plaintiff buttresses this assertion with the Affidavit of Doreen Carter, Dr. Chu's niece, which recounts two conversations with Dr. Chu regarding his desire to have Paul inherit some or all of the retirement annuities. Carter Aff. ¶ 9. In the first, Ms. Carter avers that Dr. Chu told her that "he wanted his Yale retirement to go to Paul." *Id.* In the second, she recounts that she had told Dr. Chu about an individual from Connecticut who had experienced difficulties after donating his home to The Legion; she describes Dr. Chu as deeply disturbed and recalls he said that "[The Legion] would never see his money, but that he

would 'spend as much as he could, then leave the rest to Paul.'" *Id.* While the Carter Affidavit generally refers to events in 2008 and 2009, it is frustratingly ambiguous regarding the dates of the two conversations, though a better interpretation is that they were contemporaneous with the other events that she relates.

After Dr. Chu's death on November 19, 2009, Dr. Chu's annuities were paid to The Legion. Complaint ¶¶ 25–26; P. Ex. 2 (Actions) at 10.[12] By the time Paul was appointed to serve as Dr. Chu's executor by the East Providence Probate Court in October 2010, all of the annuities were gone. Complaint ¶¶ 26–28. Paul initiated this litigation on November 9, 2012.

B. *The Complaint*

The First Amended Complaint consists of five Counts. Counts II and III claim that The Legion exerted undue influence over Dr. Chu, inducing him to leave his annuities to it instead of to his Estate, and that this undue influence continued through predatory means as he declined in health and capacity. Count IV asserts that Dr. Chu was the victim of fraud committed by his spiritual advisors based on The Legion's cover-up of the growing scandal surrounding Father Maciel. It asserts that this is a claim for which Plain-

tiff, as Dr. Chu's executor, is entitled to seek recovery. Count V alleges that the coercive and deceitful tactics employed by The Legion, particularly when targeted on a victim like Dr. Chu who relied on it for spiritual advice, are sufficiently egregious to justify an award of punitive damages.[13] Finally, Count I is based on R.I. Gen. Laws § 33–18–17, a statute that permits an "interested person" to commence suit for the benefit of an estate if the executor has refused to do so; as pled, this Count appears to assert a claim of tortious interference with Dr. Chu's succession plan based on The Legion's wrongful subversion of Dr. Chu's familial and charitable intent.[14]

## II. LAW AND ANALYSIS

A. *Summary Judgment Standard*

Under Fed.R.Civ.P. 56, summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Taylor v. Am. Chemistry Council,* 576 F.3d 16, 24 (1st Cir.2009); *Commercial Union Ins. Co. v. Pesante,* 459 F.3d 34, 37 (1st Cir.2006) (quoting Fed.R.Civ.P. 56(c)). A fact is material only if it possesses the capacity to sway

---

**12.** *See* n. 4.

**13.** It is far from clear that Count V states a viable claim. *See* R.I. Gen. Laws § 9–1–8 (no exemplary damages for causes of action brought by executor for injury to decedent prior to death). However, this motion does not tread near the merits of Plaintiff's claims; therefore, this issue will not be addressed further in this report and recommendation.

**14.** Count I is puzzling: it is based on the statute that permits a "person legally interested" to sue for the benefit of the estate if the executor refuses following written notice to do so. However, Plaintiff is not a mere interested person—he is the executor and he is

suing in that capacity. This Count may be included because of confusion over the viability under Rhode Island law of a cause of action for tortious interference with an inheritance. *Umsted v. Umsted,* 446 F.3d 17, 22 (1st Cir.2006) (federal court declines to confer standing on will beneficiaries to pursue tort of tortious interference outside of the statutory scheme created by R.I. Gen. Laws § 33–18–17); *Henry v. Sheffield,* 856 F.Supp.2d 345, 350–51 (D.R.I.2012) (claim for tortious interference with inheritance must be asserted under R.I. Gen. Laws § 33–18–17). I will not speculate—the parties do not discuss this conundrum and neither will I.

the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the nonmoving party. *Estrada v. Rhode Island,* 594 F.3d 56, 62 (1st Cir.2010); *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000) (quoting *Sánchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir.1996)). However, the non-moving party may not rest merely on conclusory allegations or denials, but must present affirmative evidence of specific facts demonstrating a genuine issue as to each element on which he will bear the ultimate burden at trial. *See Santiago–Ramos,* 217 F.3d at 53 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." *Johnston v. Urban League of R.I., Inc.,* C.A. No. 09–167S, 2011 WL 2297655, at *3 (D.R.I. May 17, 2011) (alteration in original) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)). The non-moving party's evidence must have substance in that "it limns differing versions of the truth which a fact finder must resolve." *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). The evidence must also be in a form that permits the court to conclude that it will be admissible at trial.

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the plaintiff's standing is challenged by the defendant's summary judgment motion based on the absence of a genuine issue of material fact, summary judgment should be granted unless facts "specifically averred" by the plaintiff contradict facts "specifically averred" by the defendant. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (granting summary judgment due to lack of standing). Nevertheless, while the absence of a dispute over material facts is a necessary condition for granting summary judgment, it is not a sufficient condition—the moving party must also show that he is entitled to judgment as a matter of law. *In re Varrasso,* 37 F.3d 760, 764 (1st Cir.1994).

**B.** *Standing of Plaintiff as Executor to Maintain Claims Based on Fraud and Undue Influence*

 Standing prevents "kibitzers, bureaucrats, publicity seekers, and 'cause' mongers from wresting control of litigation from the people directly affected." *Ill. Dept. of Transp. v. Hinson,* 122 F.3d 370, 373 (7th Cir.1997). If a plaintiff lacks standing to bring a matter before a court, the court lacks jurisdiction to decide the merits of the underlying case. *Libertad v. Welch,* 53 F.3d 428, 436 (1st Cir.1995). Standing is a threshold issue, focused on whether the court has the power to hear the case, and whether the putative plaintiff is entitled to have the court decide the merits of the case. *Id.* The inquiry into a plaintiff's standing involves "a blend of constitutional requirements and prudential considerations." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

 There are three "irreducible constitutional minimum" elements of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, a plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, there must be a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. *Id.* Finally, it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561, 112 S.Ct. 2130. To establish standing at the summary judgment stage, a plaintiff cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts, which, for purposes of the summary judgment motion, will be taken to be true. *Id.; see generally* Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III,* 91 Mich. L.Rev. 163, 205 (1992) (tracing history of injury in fact requirement).

 In addition to these constitutionally-required elements, standing incorporates prudential considerations. Specifically, a court must determine (1) whether a plaintiff's complaint falls within the zone of interests protected by the law invoked; (2) whether the plaintiff is asserting his own rights and interests, and not those of third parties; and (3) that the plaintiff is not asking the court to adjudicate abstract questions of public significance. *Libertad,* 53 F.3d at 436. "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at

the successive stages of the litigation." *Council of Ins. Agents & Brokers v. Juarbe–Jimenez,* 443 F.3d 103, 108–09 (1st Cir.2006). The standing analysis focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry. *Libertad,* 53 F.3d at 437 n. 5.

With these principles in mind, I turn to the issues presented in this case.

 The First Amended Complaint squarely grounds Plaintiff's standing on his capacity as the executor of Dr. Chu's Estate. *See Sheehan v. Richardson,* 315 B.R. 226, 235 (D.R.I.2004), *aff'd,* 185 Fed. Appx. 11 (1st Cir.2006) (to resolve capacity in which litigant is sued, whether individually or in representative capacity as executor, court must evaluate complaint as a whole). It provides that he was named by Dr. Chu in his will to serve as his personal representative and was appointed to serve in that capacity by the East Providence Probate Court in October 2010. Complaint ¶ 1. As executor, Plaintiff is not only the person chosen by Dr. Chu to carry out the directions of his will, but also is empowered by Dr. Chu to be his personal representative after death and to carry out that task as a fiduciary and quasi-court officer, cloaked with the presumption that he will not fail to perform or exceed his authority in the discharge of his duties. *In re Estate of Dermanouelian,* 51 A.3d 327, 332 (R.I.2012); 31 Am.Jur.2d *Executors & Administrators* § 4 (Nov. 2013).

Under Rhode Island law, an executor like Paul is expressly empowered to bring, prosecute and defend claims of or against the testator that survived his death. R.I. Gen. Laws § 9–1–7; *see Umsted v. Umsted,* 446 F.3d 17, 20–21 (1st Cir.2006) (estate is proper plaintiff to assert claim that *inter vivos* transfer induced by undue influence or tortious interference). Also un-

der Rhode Island law, it is well settled that the claims that Plaintiff asserts here—fraud, deceit and undue influence—all survived Dr. Chu's death. R.I. Gen. Laws § 9–1–6(3) (causes of action and actions for damages to "personal estate" survive the death of the plaintiff); *see Bullowa v. Gladding,* 40 R.I. 147, 100 A. 249, 251–55 (1917) (action for deceit survives death of claimant and may be prosecuted against executrix); *Reynolds v. Hennessey,* 17 R.I. 169, 20 A. 307, 309 (1890) (decedent's administrator has standing to bring claim based on false, fraudulent and deceitful conduct that injured decedent before death); *see People's Bank Nat'l Ass'n v. D'Ambra,* PC 88–5493, 1991 WL 789891, at *1–2 (R.I.Super.Ct. Oct. 25, 1991) (co-executors may sue joint savings account holder for fraud and undue influence committed against the testator before death).

 The Legion argues that this Court must narrowly interpret the reference in R.I. Gen. Laws § 9–1–6(3) to the "personal estate" of a decedent as precluding a survival claim unless the suit is for conduct directly affecting the estate. This argument ignores Rhode Island's seminal decision, Bullowa, which rejected The Legion's cramped interpretation in favor of "greater breadth and liberality." 100 A. at 254–55 (survival of rights of action by and against executors are reciprocal so actions that survive against executor also survive in favor of executor). Actions survive an individual's death if the underlying tort caused injury to any "species of property" belonging to the injured party. *Id.* at 251. The Rhode Island General Assembly has confirmed the breadth of what claims survive death, making clear that "personal estate," as the term is used in the survival statute, R.I. Gen. Laws § 9–1–6(3), includes "choses in action ... and all other property whatsoever." R.I. Gen. Laws § 33–5–1(1). Thus, under Rhode Island

law, a survival claim is the property of the testator before death and becomes an asset of his estate after death, with the power to maintain or initiate a suit to recover on the claim vested in his executor. *See Votolato v. McCaull,* 80 R.I. 301, 96 A.2d 329, 331 (1953) (right and duty of personal representative to pursue decedent's property where decedent has conveyed it away by reason of fraud practiced on him); *Hazard v. Engs,* 14 R.I. 5, 8 (1882) (executor is not only representative of will, "[he is] the legal owner of the testator's personal estate").

Well-reasoned cases from other states confirm that an executor has standing to bring a survival claim both because the injury to his testator before death diminishes the estate and because the claim is an asset owned by the estate. For example, the Texas Supreme Court examined a challenge to the standing of an executrix and held that, because a decedent's survival claim becomes an asset of her estate at death, it follows that the estate retains a justiciable interest in the survival action. *Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 848, 850 (Tex.2005). As the court explained, the executrix may bring a survival action to seek redress for the decedent's own claims for the injuries inflicted by the defendant, which she would have had standing to bring had she lived; due to her death, a representative must pursue the claim on her behalf. *Id.* at 850. The change wrought by death in the status of the party authorized to assert the decedent's personal injury claim does not change the fact that the decedent has been personally aggrieved and does not eliminate the decedent's justiciable interest in the controversy. *See Glickstein v. Sun Bank/Miami, N.A.,* 922 F.2d 666, 670 (11th Cir.1991) (decedent's estate had standing because "[t]he traditional requirement that the plaintiff show an injury in fact that is fairly traceable to the conduct

of the defendant is met by the allegation in the complaint that the defendants' actions resulted in the diminishment of the assets of the estate"). When a decedent has been personally aggrieved by a defendant's conduct, the survival action advances a "real controversy" between the estate and the defendant that "will be actually determined by the judicial declaration sought." *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661–62 (Tex. 1996). The fact that the resulting recovery may not be distributed to creditors and beneficiaries of the estate does not eliminate standing of the personal representative. *Drewen v. Bank of Manhattan Co. of N.Y.*, 31 N.J. 110, 155 A.2d 529, 531–534 (1959) (administrator of estate has standing in claim to enforce contract based on injury to decedent even though enforcement will not result in realization of assets for distribution under will).

Applying these principles, courts routinely find that it is the executor who has standing to challenge an *inter vivos* charitable gift based on fraud or undue influence and that the proceeds of such claims fall into the deceased donor's estate. *Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 412 N.Y.S.2d 593, 385 N.E.2d 285, 288 (1978) (administrator of estate prosecutes claim against recipient of charitable donation from decedent based on fraud and undue influence); *In re Brandon*, 79 A.D.2d 246, 247, 436 N.Y.S.2d 329 (1981) (executrix of estate initiated action claiming that decedent's charitable gift made before death to nursing home induced by fraud and undue influence); *see Traub v. Zlatkiss*, 559 So.2d 443, 447 (Fla. Dist.Ct.App.1990) (when transfers by decedents are subject to rescission due to fraud or undue influence, cause of action for rescission may be brought by personal representative of decedent's estate). Similarly, when a change of beneficiary form for an annuity is procured through the

exercise of undue influence, and there is no other valid beneficiary, the court awards the proceeds to the estate of the decedent. *Allstate Life Ins. Co. v. Estate of Reed*, 619 F.Supp.2d 262, 273 (S.D.Miss.2007). The all-encompassing nature of the interest of an estate in curing a wrong committed against the testator is illustrated by a decision from this Court, which held that an estate "benefits" from "an action to recover that property . . . as a means of carrying out the [decedent's] testamentary intent." *See Henry v. Sheffield*, 856 F.Supp.2d 345, 350–51 (D.R.I.2012) (holding that claim that trust should have been distributed directly to plaintiffs was "for the benefit of the estate" because it allegedly was to implement testator's intent).

Under Rhode Island decisions, when a charitable gift fails, the proceeds fall into the residue of the testator's estate as a matter of law, even if the testator's charitable intent was plain; the Rhode Island Supreme Court leaves it to the discretion of the executor to carry out the intent of his testator. For example, in *Todd v. St. Mary's Church*, the Rhode Island Supreme Court addressed what should happen when a charitable bequest is invalid, yet the testator's charitable intent is clear. 45 R.I. 282, 120 A. 577, 578 (1923). In *Todd*, the will bequeathed $3,000 to the Church for care of a burial plot, with any funds not needed for that purpose to go to the Church. *Id.* Because a gift to maintain a burial plot must be made to the town, the charitable bequest was invalid. *Id.* The Supreme Court directed that the bequest should fall into the residue of the estate and that, in the discretion of the executors, they should endeavor to carry out the plain intent of the testator to make a donation for religious purposes to the Church. *Id.; see Meehan v. Hurley*, 51 R.I. 51, 150 A. 819, 819 (1930) (bequest to purchase flowers for grave in perpetuity is

void, so that fund reverts to estate and executor in the exercise of his discretion should procure perpetual care under the authority of the General Laws).

To summarize, well-settled Rhode Island law establishes that Paul, as Dr. Chu's executor and personal representative, is empowered by Rhode Island law to bring claims for fraud, deceit and undue influence on behalf of Dr. Chu, the alleged victim. *See* R.I. Gen. Laws § 9–1–6(3). Those claims, "choses in action," are assets of Dr. Chu's "personal estate." R.I. Gen. Laws § 33–5–1(1). The injury allegedly committed against Dr. Chu during his lifetime subverted his intent and diminished his Estate and any recovery for that injury is payable to his Estate, whether or not there is clear evidence of charitable intent. *Todd*, 120 A. at 578; *see Henry*, 856 F.Supp.2d at 350–51. Put differently, when the testator makes a charitable donation induced by fraud and undue influence, he is injured, his estate is diminished, and his personal representative may bring a survivor claim to recover, with the proceeds of the suit to be paid into the estate for distribution based on the discretion of the executor to carry out his testator's intent. Accordingly, as a matter of law, Dr. Chu's Estate has experienced an injury in fact that is concrete and actual, an injury allegedly caused by the challenged conduct of The Legion and redressable by a favorable decision in this case. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. These principles are sufficient to establish that Plaintiff has standing to bring these claims and that Dr. Chu's general charitable intent is immaterial.[15] *Allstate Life Ins. Co.*, 619 F.Supp.2d at 273–74.

Confirming these legal principles is the undisputed fact that the unambiguous language of Dr. Chu's TIAA–CREF annuity contracts gives rise to an injury in fact to his Estate caused by The Legion's alleged fraud because the contracts made the owner's estate the default beneficiary. Accordingly, if the beneficiary designation of The Legion and its affiliate is voided due to fraud and undue influence, under the express terms of annuity contracts, the proceeds revert to Dr. Chu's Estate. Further, because the annuity contracts unambiguously lay out the path for TIAA–CREF to follow in the absence of a viable named beneficiary, they should be enforced without regard to other evidence of intent. *See Miller v. Saunders*, 80 A.3d 44, 50 (R.I.2013) (when property settlement agreement is devoid of ambiguity, court may not consider subjective intent); *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474, 481–82 (R.I.2004) (when annuity contract is unambiguous, parties are bound by its terms). *Cf. Hillman v. Maretta*, —— U.S. ——, 133 S.Ct. 1943, 1952–53, 186 L.Ed.2d 43 (2013) (Federal Employees' Group Life Insurance Act has clear and predictable procedure for designation of beneficiaries, compelling courts to disregard employee's probable intent). Accordingly, Dr. Chu's Estate has experienced an injury to a concrete, particularized and actual interest in the annuities caused by the alleged fraud, deceit and undue influence and his subjective charitable intent should not be considered. *See Andrews v. Am. Health & Life Ins. Co.*, 236 Va. 221, 372 S.E.2d 399, 402 (1988) (executor has standing to sue insurer to enforce policy

---

**15.** The Legion urges this Court to conduct an evidentiary hearing if it is inclined to recommend that its motion be denied in reliance on *Sam M. ex. rel. Elliott v. Carcieri*, 610 F.Supp.2d 171, 180 (D.R.I.2009), *rev'd on other grounds*, 608 F.3d 77, 83 (1st Cir.2010).

*Sam M.* required a hearing to evaluate the suitability of proposed Next Friends pursuant to Fed.R.Civ.P. 17(c). *Id.* Where the undisputed facts and applicable law clearly establish Plaintiff's standing to prosecute this suit, no evidentiary hearing is necessary.

based on insurance contract that made estate decedent's default beneficiary).

Based on the foregoing, I find that Plaintiff has standing to pursue these claims.

## C. *Cy Pres Doctrine is Not Applicable*

The Legion borrows from the *cy pres* doctrine to build its argument that Dr. Chu's general charitable intent—undisputed, it contends—to make a Catholic charity the beneficiary of his annuities strips his executor of standing because Paul himself would never inherit these annuities, so there is no injury to the Estate.

*Cy pres* is a common law doctrine that has been codified in Rhode Island at R.I. Gen. Laws § 18–4–1. Its application is limited to circumstances where the purposes of a donor "cannot be literally carried into effect." *Id.* When the *cy pres* doctrine is implicated by the impossibility of carrying out the expressed intent of the donor, the court must determine whether the donor was possessed of "general charitable intent." *Gladding v. St. Matthew's Church,* 25 R.I. 628, 57 A. 860, 864 (1904). General charitable intent is found when the evidence establishes that the donor was motivated by the desire to benefit a charitable purpose. *Id.* In that event, the trustee will be instructed by the court to redirect the donation to another charity "as near as" (the translation of *"cy pres"*) the original intent as possible. *See* R.I. Gen. Laws § 18–4–1. On the other hand if the court finds that the charitable intent of the donor was specific to the named charity, the gift reverts to the estate of the donor for distribution to the beneficiaries of any will or the heirs-at-law. *Indus. Nat'l Bank of R.I. v. Glocester Manton Free Pub. Library,* 107 R.I. 161, 265 A.2d 724, 727 (1970); *Gladding,* 57 A. at 864.

The Legion's reliance on the doctrine of *cy pres* is misplaced. Courts resort to *cy pres* only when, due to changed circumstances or circumstances not known to the donor, his literal intent has become impossible to effectuate. *City of Newport v. Sisson,* 51 R.I. 481, 155 A. 576, 578 (1931) (when changed circumstances after 1923 made it impossible to operate school in building donated for that purpose in 1863, *cy pres* is applicable); *Joslin Diabetes Ctr., Inc. v. Whitehouse,* C.A. No. WC 02–0333, 2002 WL 1804083, at *3 (R.I.Super.Ct. July 30, 2002) (when it is impossible or highly impractical to administer trust in accordance with will because of zoning restrictions, *cy pres* is applicable). The parties have not cited, and this Court has not found, any Rhode Island cases that apply the *cy pres* doctrine to a suit to void a charitable donation because it was induced by fraud and undue influence. Further, the only case found that mentions *cy pres* in connection with a charitable gift voided by undue influence holds that it is the executor who may invoke the doctrine to carry out the testator's intent. *In re Estate of Edel,* 182 Misc.2d 878, 700 N.Y.S.2d 664, 667 (N.Y.Sur.Ct.1999) (executor's motion for summary judgment to defeat claim that undue influence induced bequest to hospital denied due to fact issue regarding testator's relationship with disinherited son; at trial, if undue influence is proved, *cy pres* should be invoked by executor to insure estate passes as testator intended).

One might hypothesize that, if Paul were prosecuting this suit in his own name as Dr. Chu's heir, instead of as Dr. Chu's executor, there could be a germ of viability to this argument in that the standing of a claimant who is not the executor, but rather just an interested person under R.I. Gen. Laws § 33–18–17, may well depend on the estate documents prepared before the alleged undue influence began. *Dau-*

*ray*, 2012 WL 4043292, at *7 (where "trusts and wills in force before the alleged fraud and undue influence [of the Legion] all benefited only charity," decedent's niece has no pecuniary interest and lacks standing); *see Beard v. N.Y. Life Ins. & Annuity Corp.*, No. 12AP–977, 2013 WL 4678105, at *7 (Ohio Ct.App. Aug. 27, 2013) (son lacks standing to pursue claim for breach of fiduciary duty owed to decedent because he is not executor). However, *Dauray* does not resort to reliance on the *cy pres* doctrine. In any event, in dicta, *Dauray* affirms that, while evidence of exclusively charitable intent preceding the period of undue influence eliminates the standing of someone whose sole relationship is that of potential heir, it does not affect the standing of the executor himself. *See id.* at *7. The final nail in this hypothetical coffin is the undisputed fact that Paul was the primary beneficiary of the retirement annuities before The Legion's influence over Dr. Chu began.

It must be noted that The Legion's theory—that general charitable intent of a donor divests his executor of standing to bring a survival action for fraud that induced the gift—leads to the anomalous result that a corrupt spiritual adviser can cloak himself in the fruits of his fraud to acquire immunity from suit. As long as the spiritual adviser's predatory conduct completely overwhelms the testator, inducing him to direct all of his assets to the adviser's charity, the charity cannot be sued because no person or entity would have standing to redress the wrong. There is no principled basis for such use of standing "as a sword" to deprive executors of their legal right to seek recovery under Rhode Island law for an actionable wrong inflicted on the testator. *Culhane v. Aurora Loan Servs. of Neb.*, 708 F.3d 282, 291 (1st Cir.2013) ("[t]here is no principled basis for employing standing doctrine as a sword to deprive mortgagors of legal pro-

tection conferred upon them under state law"); *Mruk v. Mort. Elec. Registration Sys., Inc.*, 82 A.3d 527, 535 (R.I.2013) (standing should not be used as sword to defeat right of homeowner to ensure attempted foreclosure is lawful). This Court should not adopt a rule of law that "close[s] the courthouse doors" simply because the fraud was so successful that the testator was induced to donate all of a class of assets to the perpetrator. *See Mruk*, 82 A.3d at 536.

## D. *There is a Material Factual Dispute Regarding Dr. Chu's Charitable Intent*

■ While the preceding analysis establishes that whether Dr. Chu's charitable intent was general or specific is legally immaterial to the standing of his executor to bring these claims, in the interests of completeness, I linger to address The Legion's argument that Dr. Chu's general charitable intent, as that term has been defined in the *cy pres* context, is established by undisputed facts, so that his Estate lacks standing to sue for fraud and undue influence.

■ In considering this issue, the Court must be mindful that The Legion's argument is focused on intent, which is a matter generally deemed ill-suited to summary judgment—as the First Circuit has cautioned, "courts must be exceptionally cautious in granting *brevis* disposition in such cases." *In re Varrasso*, 37 F.3d at 764 (citing *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983)). Nevertheless, issues involving state of mind can be resolved at the summary judgment stage "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz*, 896 F.2d at 8. However, both parties

must point to evidence that carries the potential for admissibility at trial. *See Vazquez v. Lopez–Rosario,* 134 F.3d 28, 36 (1st Cir.1998); *Matias v. Amex, Inc.,* CA 10–80 S, 2013 WL 795056, at *1 (D.R.I. Mar. 4, 2013).

The Legion relies on Dr. Chu's designation of The Legion (and its affiliate) as the primary beneficiaries of his retirement annuities, punctuated briefly by the contingent designation of Mother Teresa's Missionaries of Charity, from 1998 until his death. It points to the Baize Declarations as establishing the absence of any designation of his Estate or his son during the same period. It contends that these records constitute undisputed evidence of general charitable intent. The Legion's argument founders on the beneficiary designations Dr. Chu made before becoming involved with The Legion: until 1998, Paul was the primary beneficiary and Mother Teresa's Missionaries of Charity was the contingent beneficiary (and primary on "certain" of the annuities). This evidence establishes that Dr. Chu's family was the primary target of his munificence until the alleged undue influence began. Standing alone, it constitutes substantial evidence fatal to The Legion's contention that Dr. Chu's general charitable intent is undisputed. *Dauray,* 2012 WL 4043292, at *7.

The rest of the facts pointed to by both parties are a muddle.

The Legion points to the unauthenticated Letter of December 23, 2003, purportedly written by Dr. Chu, which includes the statement, "I can give all [my wealth] to Him! I don't worry about Paul." Dec. 23, 2001, Letter, at 2. The Legion appended the Letter to its Statement of Undisputed Facts with no indication of its provenance. Nor does The Legion explain the basis on which the hearsay declarations of Dr. Chu in the Letter would be admissible in evidence. Plaintiff vigorously disagrees with The Legion's interpretation of the meaning of the Letter. PSDF ¶ 10. However, he has not disputed that it was written by Dr. Chu. It is questionable whether this Court should consider the declarations in the Letter in considering whether there is a factual dispute regarding the scope of Dr. Chu's charitable intent; nevertheless, in the absence of an objection to its admissibility, it may remain in consideration. *See Carmona v. Toledo,* 215 F.3d 124, 131–32 (1st Cir.2000) (failure to authenticate precludes consideration of document at summary judgment); *Ramirez–Lluveras v. Pagan–Cruz,* 833 F.Supp.2d 165, 169–70 (D.P.R.2011) (plaintiff's sworn statement declaring that document produced during discovery enough to establish potential admissibility for consideration at summary judgment phase).

Equally messy is Plaintiff's reliance on TIAA–CREF's business records from 2008 establishing that TIAA–CREF listed either no beneficiary or the Estate as beneficiary. While the Baize Declarations imply that these business records resulted from errors by TIAA–CREF, they do not say so. As a result, they leave the door cracked for further factual development, including the possibility that the circumstances of the "mistake" may establish that the designation of no beneficiary actually was consistent with Dr. Chu's intent to replace The Legion with his Estate. While Plaintiff's failure to lay a foundation for its interpretation of the records is troublesome, the records themselves are enough to permit the conclusion that they are susceptible of conflicting interpretations, which tips against summary judgment. *Gerffert Co., Inc. v. William J. Hirten Co.,* 815 F.Supp.2d 521, 535 (D.R.I. 2011) (if evidence presented is subject to conflicting interpretations, summary judgment improper).

The most controversial evidence of Dr. Chu's intent is the Affidavit of Doreen Carter, which recites two conversations with Dr. Chu, in which he told her of his intent to leave some of his annuities to Paul and not to leave anything to The Legion. D. Carter Aff. ¶ 9. The Legion argues vociferously that these declarations are rank hearsay, not admissible in evidence under any theory. It challenges the Affidavit's admissibility because it is vague on the date of the two declarations, because Ms. Carter is a family member, causing her Affidavit to lack "circumstantial guarantees of trustworthiness" and because Dr. Chu's mental capacity for the time period of the declarations (2008–2009) is in issue.

While the Affidavit certainly could have been crisper in pinning down the dates of the two conversations, the vague reference to 2008 and 2009 is sufficiently plain to establish that the time frame is at the end of Dr. Chu's life when he was worried about what he had heard about Father Maciel. Further, The Legion's suggestion that Ms. Carter stands to benefit if Plaintiff is successful in this suit is devoid of support in the record; Paul, Mother Teresa's Missionaries of Charity and Dr. Chu's Estate are the only potential alternative beneficiaries. Rather, the Affidavit appears to be based on the memory of a disinterested and caring family member of Dr. Chu, evincing circumstantial guarantees of trustworthiness. The biggest problem, as The Legion correctly points out, is that Dr. Chu's mental capacity is in issue during the period when he made these declarations. Indeed, Dr. Chu's cognitive functioning in 2008 is likely to be a core issue for determination by the fact finder at the trial of this case. Rather than either peremptorily excluding these declarations for purposes of summary judgment or conducting an evidentiary inquiry on mental capacity that will rival the trial in complexity and expense, I conclude that Dr. Chu's mental capacity at the time of these declarations should be set aside and not considered in assessing their potential admissibility solely for purposes of creating a fact issue at the summary judgment phase. *Galindez v. Miller*, 285 F.Supp.2d 190, 197 (D.Conn.2003) (inappropriate to grant summary judgment when proffered submissions point to potentially admissible evidence that raises genuine dispute of material fact). The ultimate determination as to admissibility will be made at the time of trial.

Accordingly, while a close call, I conclude that these declarations are potentially admissible under either Fed.R.Evid. 803(3), the exception for statements of the declarant's then-existing intent,[16] or Fed. R.Evid. 807, the residual exception. *Amcast Indus. Corp. v. Detrex Corp.*, 779 F.Supp. 1519, 1526 (N.D.Ind.1991), *aff'd in relevant part, rev'd in part*, 2 F.3d 746 (7th Cir.1993) (doubts as to admissibility should be resolved in favor of admissibility at the summary judgment stage); 95 C.J.S. *Wills* § 38 (2013) (on the issue of testamentary capacity, evidence of the testator's declarations of his or her testamen-

---

**16.** The Legion asseverates that Fed.R.Evid. 803(3) may only be used to prove that the declarant acted after the statement consistently with the stated intent. This argument tips the Rule on its head—the thrust of Fed. R.Evid. 803(3) is that hearsay may be admissible to prove intent, not to prove an action consistent with that intent. *See 2 McCormick on Evidence* § 275 (7th ed. 2013) (reliance on declarations of state of mind to prove subsequent conduct is not main use contemplated by the Rule). Pursuant to Fed.R.Evid. 803(3), the Carter Affidavit is offered to establish that Paul was an object of Dr. Chu's donative intent at the end of his life. It is not offered to prove that Dr. Chu acted consistently with that intent; plainly, he did not.

tary intentions is admissible); R.E. Heinselman, *Admissibility of declarations of testator on issue of undue influence,* 79 A.L.R. 1447 (1932) (declarations of the testator made before or after the execution of the will tending to show his affection for son, who was practically disinherited by the will, held admissible).

Fed.R.Evid. 803(3) renders admissible relevant statements that are contemporaneous with the mental state sought to be proven as long as there are no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his thoughts. *Weinstein's Federal Evidence* § 803.05[2][a] (2013). While The Legion rightly criticizes the Carter Affidavit for its lack of a precise articulation of timing, it remains clear that these declarations occurred during 2008 or 2009, the critical relevant period. *See Colasanto v. Life Ins. Co. of N. Am.,* 100 F.3d 203, 213 (1st Cir.1996) (quarrel between decedent and beneficiary could disrupt contemporaneity so that declaration made after quarrel not admitted as evidence of intent prior). Further, leaving aside Dr. Chu's mental state, the circumstances of the declarations—conversations with a niece who had no interest in his estate—are utterly devoid of anything suspicious. Under Fed. R.Evid. 807, admissibility turns on similar considerations of trustworthiness, augmented by the probity of the declarations and whether admitting them serves the interests of justice, both of which are satisfied here. Indeed, there can be no better articulation of Dr. Chu's intent, unsullied by the alleged influence of The Legion, than a contemporaneous declaration to a disinterested family member as described in this Affidavit. I find that these declarations are potentially admissible as evidence of Dr. Chu's donative intent at the end of his life. *See Aetna Life Ins. Co. v. Wise,* 184 F.3d 660, 665–66 (7th Cir.1999) (suicide note admissible to show intent to

make beneficiary change on life insurance policy); *Krimlofski v. United States,* 190 F.Supp. 734, 742–47 (N.D.Iowa 1961) (statement by insured admissible to throw light on intent to designate beneficiary on policy).

All in all, through this muddle, one thing clearly emerges: the record in this case has more than sufficient evidence from which a fact finder could conclude that, absent the influence of The Legion, Dr. Chu's beneficiary for some or all of his annuities would not necessarily have been another Catholic charity. Accordingly, I find that there is a genuine fact dispute regarding Dr. Chu's charitable intent. To the extent that the nature and scope of Dr. Chu's charitable intent is relevant to the standing of his executor to bring these claims, I recommend that this Court deny The Legion's motion for summary judgment based on this factual dispute.

## III. CONCLUSION

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (ECF No. 30) be denied.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its service. *See* Fed. R.Civ.P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. *See United States v. Lugo Guerrero,* 524 F.3d 5, 14 (1st Cir.2008); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980).