William S. Todd *et al. vs.* St. Mary's Church, Portsmouth, R. I. *et al.*

APRIL 27, 1923.

Present: Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

*(1) Wills. Invalid Trusts. Care of Burial Lot.*

Testamentary provision bequeathing a sum of money in trust to a church
the income to be used for the care of the burial lot and stone of testator,
the balance of the income over the amount required for that purpose to be
used at the discretion of the vestry of the church.

*Held*, the balance of income over the amount required was clearly intended by testator as a gift for religious purposes in accordance with the discretion of the vestry of the church.

*Held*, further that the bequest to trustees for the care of the burial lot in perpetuity was invalid but the portion so bequeathed being ascertainable, if not used in administration of the estate would fall into the residue.

(*2*)　*Wills. Care of Burial Lot.*

Where a testator attempted by means of an invalid trust to provide for the care of his burial lot and stone, as the estate is solvent the executors may in their discretion endeavor to carry out the intention of testator, by paying under provisions of Gen. Laws, cap. 318, § 4, to the cemetery corporation a sum for the perpetual care of the lot, the amount of the payment to be determined by the probate court and allowed as part of the funeral charges.

(*3*)　*Wills. Trusts. Conflicting Clauses.*

Where a will provided for the payment of a sum to a church for religious purposes to be held in trust and in another clause provided for a trustee for all sums placed in trust except one specified gift, although the provisions are in conflict, it appears that testator did not have the trust for religious purposes in mind in making the later provision, and the trustee is not trustee of that trust.

(*4*)　*Trusts. Passive Trusts.*

Where the control of the income of a trust is placed in the hands of the beneficiary, the trust is executed by the statute of uses and the fund passes to the beneficiary.

(*5*)　*Wills. Trusts. Income.*

Testamentary gift of a fund to be placed in trust, the beneficiary "to have the income her life after her to be equally divided among her surviving children."

*Held*, that on death of beneficiary, the surviving children took the fund, rather than the income, to be divided equally among them.

(*6*)　*Wills. "Heirs." "Children." "Issue."*

The words "heir" or "heirs" are terms of technical import and include all who might succeed in case of intestacy, but they are sometimes used popularly as words of description in the sense of "children" or "issue." In the construction of a will the latter interpretation is permissible when that clearly appears to have been the intention of testator.

(*7*)　*Wills. "Heir."*

Testamentary provision "To X and his wife for their life if they shall have an heir it shall go to said heir after them."

*Held*, the word "heir" should be given the interpretation of "child" "children" or "issue" of the marriage of X and his wife, such descendants to take *per stirpes*.

*(8)  Wills.  Trusts.*

Testamentary provision "To X and wife the sum of $2,000 to be placed in trust they to have the income of the same should his wife survive him then it shall go to her."

*Held,* that during the lives of X and his wife the income of the fund belonged to them in equal shares and if the wife survived the fund belonged to her, but if X survived his wife, the entire income belonged to him for life and upon his death the fund fell into the residue of the estate.

*(9)  Wills.  Intestate Estate.*

Where testator provided that the residue should be reduced to money and divided into fifty equal parts and bequeathed forty-eight of the parts, he died intestate as to the other two parts, and they should be distributed in accordance with the statute as to distribution of intestate estate.

BILL IN EQUITY for construction of will. Certified from Superior Court.

SWEETLAND, C. J. This is a bill in equity praying for the construction of the third, seventh, eighth, thirteenth and sixteenth clauses of the will of John C. Gardner, late of Portsmouth, deceased. In the Superior Court the cause being ready for hearing for final decree was certified to this court for final determination.

The will is not skillfully drawn. In some respects its language appears to the complainants to be ambiguous. The third clause is as follows: "Thirdly: I bequeathe to St. Mary's Church of Portsmouth, R. I. Three Thousand (3000.00) Dollars to be placed in trust, the income of which to be used for the care of my lot and stone which I wish to be kept free from moss that may gather on said stone. If the income is more than sufficient for this purpose the balance shall be used at the disgression of the vestry." In using the word "disgression" the testator undoubtedly intended to use the word "discretion." By this clause the testator clearly intended to give $3,000 to St. Mary's Church at Portsmouth, to be held in trust, to use such portion of the income therefrom as should be required to care for the testator's burial lot and to use the balance for religious purposes in accordance with the discretion of the vestry of the church. It is agreed by the parties that the income of the sum of $500 would be

amply sufficient to keep the testator's cemetery lot and the monument thereon in good order and repair. It is established in this state that a bequest to trustees in perpetuity for the care of a burial lot is not for charitable uses and is invalid. *Kelly* v. *Nichols*, 17 R. I. 306; *Sherman* v. *Baker*, 20 R. I. 446; *Shippee* v. *Industrial Trust Co.*, 43 R. I. 115. In *R. I. Hospital Trust Co.* v. *Town Council*, 29 R. I. 393, it was held that a gift for such purposes if made to a town council in accordance with the provisions of Section 37, Chapter 50, General Laws, 1909, is valid. The portion of the sum of $3,000, which was bequeathed upon an invalid trust, because for a private use, is ascertainable, and the same if not used in administration of the testator's estate will fall into the residue thereof.

This estate is solvent and, under the authority of our statute, the executors may in their discretion endeavor to carry out what was plainly the intention of the testator. (2) Section 4, Chapter 318, General Laws, 1909, provides, among other things, that the executor or administrator of a solvent estate "may pay to a cemetery corporation or to a town or city a reasonable sum for the perpetual care of the lot in which the body of his testator or intestate is buried." The amount of the payment is to be determined by the probate court and the payment allowed as part of the funeral charges.

The remainder of the sum placed in trust under the third clause of the will, or $2,500, is given for religious purposes which constitutes a good charitable trust and the executor should pay that sum to said church to hold in trust, the income thereof to be applied in accordance with the discretion of the vestry of the church. The complainants have (3) argued to us that William S. Todd should hold said $2,500 as trustee, because of the provision in the eighteenth paragraph of the will naming Mr. Todd "trustee for all sums placed in trust except the trust mentioned to Mr. Christopher Manchester." This provision appears to us to conflict with the language of the third clause. In the case of other

trusts created by the will, which were for the lives of persons in being with remainder over, there was need of a trustee to protect the trust property until the death of the person having the life interest. The trust created by the third clause was a charitable trust, and will undoubtedly continue long after the life of Mr. Todd. In view of the language of the third clause and the nature of the trust therein created we are of the opinion that the testator did not have that trust in mind in making said provision in the eighteenth clause, and that Mr. Todd is not trustee of the trust now in question. Also we agree with the contention of counsel for the church; if the construction of the third and eighteenth clauses together should have required that the fund go to Mr. Todd as trustee, he would have no duties to perform in regard to the trust. The control of the income is placed entirely in the hands of the officers of the church. Such a trust would (4) amount to a passive or dry trust executed by the statute of uses and the fund would pass to the church in accordance with *Guild* v. *Allen*, 28 R. I. 430.

The seventh and eighth clauses of the will are as follows: "Seventhly: I bequeathe to Mrs. Roena H. Peckham the sum of Three Thousand (3000.) Dollars, to be placed in trust she to have the income of the same her life after her to be equally divided among her surviving children.

"Eighthly: I bequeathe to Mrs. Fannie Barker, of Middletown, R. I. the sum of Three Thousand (3000) Dollars to be placed in trust she to have the income her life after her to be equally divided among her surviving children." The trustee is in doubt as to the testator's intention with regard to the gift to the surviving children of Mrs. Peckham and the gift (5) to the surviving children of Mrs. Barker. Does each group of surviving children take the trust fund or the income thereof upon the death of their mother? In our opinion upon the death of either of these ladies her surviving children take the trust fund to be equally divided among them. We consider a reasonable construction of the language to be that in each case it is the sum of three thousand dollars

which the testator intended should be divided among the surviving children and not the income upon that sum. We think this view is supported by the fact that the testator has made no other provision for the disposition of the principal of these trust funds.

The first paragraph of the thirteenth clause of the will is as follows: "Thirteenthly: If at the time of my death Mr. Christopher Manchester be living on my place known as the Harvey Place he shall have free rents and profits of (6) the same so long as he shall live there providing he shall pay the taxes of the same and keep it in good repair. After him it shall go to Clifford Peckham and wife their life if they shall have an heir it shall go to said heir after them if no heir then it shall be sold and the proceeds equally divided among said Clifford Peckham's surviving brothers and sisters." Under this paragraph the question arises as to the interpretation which should be given to the word "heir." That word and also the plural "heirs," are terms of technical import and include all who might succeed in case of intestacy. They are sometimes used popularly as words of description in the sense of "children" or "issue." In the construction of a will the latter interpretation is permissible when that clearly appears to have been the intention of the testator. (7) *Turbitt* v. *Carney,* 43 R. I. 582. In the thirteenth clause under consideration the word is apparently used in the popular sense by the testator, and should be given the interpretation of "child," "children" or "issue" of the marriage of Clifford Peckham and his wife, such descendants to take *per stirpes*. Upon the death of the survivor of Clifford Peckham and his wife, if there are no surviving descendants of their marriage, then the property is to be sold and the proceeds divided in accordance with the provisions of said clause. If upon the death of the survivor of Clifford Peckham and his wife exigency arises requiring further construction, it can be sought at that time.

The second paragraph of the thirteenth clause of said will is as follows: "I also give to Clifford Peckham and wife

(8) the sum of Two Thousand (2000) Dollars to be placed in trust they to have the income of the same should his wife survive him then it shall go to her." The trustee is in doubt as to whether, if the wife of Clifford Peckham survive him, the gift to her is of the income or the principal of the sum of two thousand dollars. The antecedent of the pronoun "it" in the phrase "then it shall go to her" is "the same" referring to the sum of two thousand dollars. During the lives of Clifford Peckham and his wife the income of the fund belonged to them in equal shares. If his wife survives Mr. Peckham the fund belongs to her. If Mr. Peckham survives his wife the entire income belongs to him during his life and on his death the fund falls into the residue of the testator's estate. The clause shows the testator's intent to benefit Clifford Peckham during his life. It is unreasonable to infer that the testator intended that Mr. Peckham should receive that benefit during the lives of himself and his wife, but should lose it upon the death of his wife. This view is supported by the fact that the testator made no disposition of the fund upon the death of the wife of Mr. Peckham during the life of Mr. Peckham.

(9) In the sixteenth clause the testator provides that the residue of his estate shall be reduced to money and divided into fifty equal parts. He then proceeds to bequeath forty-eight of said parts to various legatees. The executors ask for construction of this clause and for instruction as to the disposition which they shall make of the two parts which the testator failed to bequeath. Plainly the testator died intestate as to such two parts, and the same should be distributed in accordance with the provisions of our statute as to the distribution of intestate estate.

On May 4, 1923, at 10 o'clock a. m. the parties may present a form of decree in accordance with this opinion.

*Comstock & Canning, Andrew P. Quinn,* for complainants.
*Sheffield & Harvey,* for St. Mary's Church.
*Max Levy,* for other respondents.

Opinion of the Court to the House of Representatives.
In the Matter of the Appropriation Bill.

MAY 17, 1923.

(*1*)  *Constitutional Law.   Appropriations for Private Purposes.*

In case an appropriation bill containing distinct and separable appropriations for public and private purposes, receives the approval of the governor and becomes enrolled and promulgated as law and it should appear from the journals of either house that in such house the act had received in its favor the votes of a majority of a quorum of such house, but not of two-thirds of the members elected thereto, the court would not declare the whole act invalid but would strike out the independent appropriations for private purposes and approve the rest of the act as constitutional.

(*2*)  *Constitutional Law.   Appropriations for Private Purposes.*

Similar power is in a house of the general assembly while such an act is pending before it and if the act receives the assent of a majority but not of two-thirds of the members elected to such house, the house may treat the appropriations for private purposes as dropped from the bill and those for public purposes as having passed.

(*3*)  *Constitutional Law.   Construction.*

Constitutional provisions should be construed in accordance with their plain intent.

(*4*)  *Constitutional Law.   Legislative Records.*

The court will not assume to contradict or impeach the journal of a house of the general assembly, upon any charge of fraud or mistake, nor will it pass upon a disputed question of fact as to what proceedings were taken in the house, for the power to determine the correctness of the journal is solely in the legislative body and no other body may intermeddle therein.

(*5*)  *Constitutional Law.   Legislative Journal.   Advisory Opinion.*

For the purpose of an advisory opinion to a house of the general assembly, the court may interpret the records of a house of the assembly, in the light of the facts appearing upon such records, and give to them the construction warranted in law.

(*6*)  *Constitutional Law.   Appropriation Bill.*

The court advises that the action of the senate in "passing" certain items for private purposes, in an appropriation bill prior to the passage of the act as a whole, was tentative and in the nature of preparing the act for final passage.

(*7*)  *Constitutional Law.   Appropriation Bill.*

Where a majority of one house of the assembly voted for an appropriation act containing distinct and separable appropriations for public and private purposes, after the act had received the approval of the other house, the

items for public purposes were passed, and the private appropriations were dropped, and the act in that form should not be presented to the governor for his approval but should in its amended form, be communicated to the other house for further action.

SUPREME COURT.

May 17, 1923.

*To the Honorable Speaker and House of Representatives:*

We have received from your honorable body a request, in conformity with Section 3, Article X of the Constitution, for our written opinion upon the following questions:

"*First:* Did two-thirds of the members elected to the Senate, by their separate and unanimous vote thereon of thirty-five in the affirmative and none in the negative, assent to the appropriations enumerated under the head of "Societies" in said appropriation bill, as required by Article IV, Section 14, of the Constitution?

"*Second:* If the first question is answered in the affirmative, was a vote of two-thirds of the members elected to the Senate again necessary for an assent to the appropriations enumerated under the head of "Societies" in said appropriation bill upon the passage of the bill in concurrence as a whole?

"*Third:* If the first question is answered in the negative, was the said appropriation bill, other than the appropriations enumerated under the head of "Societies," passed in concurrence by the Senate, as required by Article XV, Section 1, of Amendments to the Constitution, for presentation to the Governor?

"*Fourth:* If the first question is answered in the negative, was the said appropriation bill in an amended form passed by the senate to be communicated to the House of Representatives?"

Accompanying said questions are the following papers, viz.: House Act No. 770, entitled, "An Act Making Appropriations for the Support of the State of Rhode Island for the

Fiscal Year Ending on the 30th Day of November, 1923," being the proposed act referred to in your questions as the "appropriation bill," also a copy of the resolution of your body requesting our answer to said questions, containing in a preamble an outline of the travel of said proposed act up to the third and fourth days of May, 1923, when the same was acted upon by the senate, and also a copy, among others, of the records of the proceedings in the senate on the third and fourth days of May, 1923, relating to said proposed appropriation act, certified as correct by the deputy secretary of state, acting as secretary of the senate.

Upon receipt of your request we gave notice that on May 15, 1923, we would hear the arguments and receive the briefs of counsel representing parties interested in said questions. At the hearing thus accorded counsel appeared and presented arguments upon the questions of law involved in your questions.

Although it was sought at the hearing before us to attack the correctness of the certified copy of the proceedings of the senate for May 4, 1923 in some particulars, no question was raised as to the accuracy of the following: "Senator Cole moves the passage of the act as a whole. The roll is called. Twenty-two Senators voting in the affirmative and 13 Senators voting in the negative. The President of the Senate declares that the Act fails of passage, stating that in accordance with Section 14 of Article IV of the Rhode Island Constitution, the Act requires a two-thirds vote of all members elected to the Senate, said Act carrying an appropriation for private purposes."

The legal uncertainties, to which your questions relate, arise by reason of the provisions of Section 14, Article IV of the Constitution. In accordance with Section 6, Article IV of the Constitution, for most purposes, a majority of the members of each house of the General Assembly shall constitute a quorum to do business. Section 14, Article IV, however, provides as follows: "Section 14. The assent of two-thirds of the members elected to each house of the

general assembly shall be required to every bill appropriating the public money or property for local or private purposes."

It appears by reference to the copy of said proposed appropriation act and to the preamble of your resolution, that, when the act was passed in your body and afterwards acted upon by the senate, it contained under the separate heading of "Societies," fourteen items appropriating money for the benefit of certain societies or associations established for charitable or educational service within the state. By reason of the constitutional provision referred to above it is plain that the passage of said fourteen items by the senate required the assent of two-thirds of the members elected thereto. We find upon an examination of the general appropriation acts, appearing in the Public Laws, that it has been the custom of the General Assembly for many years in the past to incorporate in acts, making general appropriations for public purposes, items for the aid of charitable associations, similar to the fourteen items enumerated under the heading "Societies" in the proposed act now under consideration. The joining of appropriations for public and private purposes in one act, may at times lead to some apparent confusion, as in the instant case. Such method of procedure is within the authority of the General Assembly, and although the appropriations for private purposes contained in such an act may not receive the assent of two-thirds of the members and thus fail of passage in either house, a majority of a quorum of that house is not thereby deprived of its power to pass the public appropriations in the act.

(1) In case a general appropriation act containing distinct and separable appropriations for public and private purposes should receive the approval of the governor and become enrolled and promulgated as law, and if later its constitutionality be questioned before us, and it be made to appear by the legislative journals of either house that in such house the act had received in its favor the votes of a majority of a

quorum of such house but not of two-thirds of the members elected thereto, then, in such circumstances, in accordance with well settled principles of constitutional law and statutory construction early adopted and consistently followed in this state, we would not declare the whole act invalid but would strike out the independent appropriations for private purposes as not passed in accordance with constitutional requirement, and would approve the rest of the act as valid and constitutional. *State* v. *Copeland,* 3 R. I. 33; *State* v. *Snow,* 3 R. I. 64; *State* v. *Amery,* 12 R. I. 64; *Newport* v. *Horton,* 22 R. I. 196. Similar power is in a house of the General Assembly, while such an act is pending before it. If such an act receive the assent of a majority, but not of two-thirds of the members elected to that house, the house may treat the appropriations for private purposes as having dropped from the bill, and those for public purposes as having passed. To hold otherwise would be to give a strained and unreasonable construction to the provisions of Section 14, Article IV of the Constitution. Constitutional provisions should be construed in accordance with their plain intent. The sole purpose of said Section 14, Article IV, is to prevent the appropriation of public money or proerty for local or private purposes by a vote of less than two-thirds of the members of each house. It aimed at no further restriction upon the constitutional powers of the majority of a quorum of the houses of the General Assembly.

The votes in the affirmative upon the motion of Senator Cole that the act be passed as a whole were of more than a majority of a quorum of the senate, and hence were sufficient to pass the public appropriations contained in the bill, they were less than two-thirds of the number of members elected to the senate and hence insufficient to pass the private appropriations in the bill. It is contended, however, that these private appropriations had been unanimously passed by the senate during the prior consideration of the bill on May 4, 1923. In support of that contention we are referred to the following in the certified copy of the record of the proceed-

ings of the senate for that day. After enumerating the fourteen items in question the record proceeds: "Senator Sanderson moves the passage of all the above items under the heading 'Societies', Pages 30 and 31, by a roll call vote, said items requiring the assent of two-thirds of the members elected to the senate. The said items are unanimously passed upon a roll call vote, 35 senators voting in the affirmative, there being no votes in the negative." * The accuracy of this portion of the records certified is attacked.

(4) This court will not assume to contradict or impeach the journal of the senate upon any charge of fraud or mistake; nor will it pass upon a disputed question of fact as to what proceedings were taken in the senate. The power to determine the correctness of its journal is solely in the senate itself, and no other authority may intermeddle therein. For the purpose of this advisory opinion to your body, however, we may with propriety interpret the records of the

(5) senate in the light of the facts appearing upon such records, and give to them the construction warranted in law. We treat the statement of Senator Sanderson's motion and the senate's action thereon, standing in the record, as correct, and will consider whether, in the circumstances, that statement justifies the conclusion that the senate, in unanimously adopting the motion, finally passed the private appropriations, as is contended on one side, or tentatively made the fourteen items a part of the bill, in accordance with common legislative procedure. The motion by its terms would not clearly bring to the minds of the senators that they were called upon to sanction the appropriation as a finality and that the matter would not come before them again in acting upon the bill as a whole. It may well be that such purpose was definitely in the mind of the mover of the motion and in the minds of some of those who voted for it; but we are considering what, in the circumstances, is a fair interpretation to place upon the action of the senate in unanimously adopting the motion. Some color is given to the claim of finality by reason of the language that the "passage" of the

items was moved; but it appears by the records that in the proceedings of the senate on that day the word "passed" was used to denote the action of the senate in making items "stand as a part of the Act." In the record, before the portion now under consideration, we find the entry "All items in the Act to the fourth item on Page 7 having *passed* on Thursday May 3rd, the succeeding items are read and all items to which no objection is made, stand as part of the Act." No claim is made that the items in the act standing before the fourth item on page 7 had been finally "passed" on the previous day, and reference to the record of May 3 shows that they had been adopted merely to stand as part of the act. It thus appears that the word "passed," or the related form "passage," when used in the senate on that day, might be regarded as appropriate to designate the mere adoption of an item to stand temporarily as part of the bill.

(6)     In the consideration of the proposed appropriation bill, up to the vote upon Senator Cole's motion, the senate was in effect acting as a committee of the whole, seeking to mould the act into suitable form for convenient and speedy final action. During that time, unless a different intention indisputably appears, any action of the senate should be construed as expressing a tentative purpose only.

The intention of the senate is further shown by its action upon Senator Cole's motion, when without objection, or suggestion of a limitation upon its action by reason of the unanimous adoption of Senator Sanderson's motion, the senate acted upon "the passage of the act as a whole."

Light is also thrown upon the senate's intention by the action of sixteen senators, comprising more than one-third of the members of that body. At the opening of the next legislative day these sixteen senators voted that the records of May 4th be amended so that it might appear that the unanimous vote of the senate on the Sanderson motion was not that said fourteen items be finally passed, but that they stand as part of the act. Although twenty-two senators voted against such amendment of the record, it appears by the action of the sixteen, that it was not the intention of two-

thirds of the members of the senate, in the vote on the Sanderson motion, to assent to the final passage of the private appropriations in accordance with the requirement of the Constitution.

Our opinion is that the legal construction to be placed upon the senate's action on the motion of Senator Sanderson is that it did not affect the final passage of said fourteen items of private appropriations.

In accordance with the foregoing we answer your first question in the negative.

By reason of our answer to the first question, no answer to the second is required.

*Herbert A. Rice, Herbert L. Carpenter, Attorney General, Charles R. Easton, Theodore F. Green, William W. Moss,* appeared before the Court.