**Supreme Court**

| | | |
|---|---|---|
| Mary Lou Dauray | : | No. 2013-135-Appeal. |
| | | (PB 10-1195) |
| v. | : | |
| Gabrielle D. Mee | : | |
| (a/k/a Gabrielle Malvina Mee). | | |
| Mary Lou Dauray, as heir-at-law of | : | No. 2013-136-Appeal. |
| Gabrielle D. Mee, and on behalf of the | | (PC 11-2640) |
| Estate of Gabrielle D. Mee | | |
| v. | : | |
| Legion of Christ et al. | : | |
| Mary Lou Dauray, as heir-at-law of | : | No. 2013-137-Appeal. |
| Gabrielle D. Mee, and on behalf of the | | (PC 11-2757) |
| Estate of Gabrielle D. Mee | | |
| v. | : | |
| Bank of America et al. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| Mary Lou Dauray | : | No. 2013-135-Appeal. |
|  |  | (PB 10-1195) |
| v. | : |  |
| Gabrielle D. Mee | : |  |
| (a/k/a Gabrielle Malvina Mee). |  |  |
| Mary Lou Dauray, as heir-at-law of | : | No. 2013-136-Appeal. |
| Gabrielle D. Mee, and on behalf of the |  | (PC 11-2640) |
| Estate of Gabrielle D. Mee |  |  |
| v. | : |  |
| Legion of Christ et al. | : |  |
| Mary Lou Dauray, as heir-at-law of | : | No. 2013-137-Appeal. |
| Gabrielle D. Mee, and on behalf of the |  | (PC 11-2757) |
| Estate of Gabrielle D. Mee |  |  |
| v. | : |  |
| Bank of America et al. | : |  |

Present: Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** The plaintiff, Mary Lou Dauray (plaintiff or Dauray),

brings three separate appeals, each of which challenges the Superior Court's determination that

she did not have standing in each of the three cases filed in the Superior Court, resulting in the

dismissal of her claims. The three appeals brought by Dauray are: (1) an appeal of a probate

court order admitting the will of Dauray's aunt, Gabrielle D. Mee (Gabrielle),[1] claiming that the

will was executed through undue influence, fraud, and mistake in the inducement;[2] (2) an appeal

---

[1] First names may be used throughout this decision for ease of reading. No disrespect is intended
thereby.

[2] Appeal No. 2013-135-A.

from a suit claiming that Gabrielle was unduly influenced and fraudulently induced into giving approximately $60 million in lifetime gifts to the Legion of Christ North America, Inc. (Legion of Christ);[3] and (3) an appeal from an action alleging that Bank of America, N.A. (BOA)[4] breached its fiduciary duties as the trustee of multiple trusts set up by Gabrielle and her late husband.[5]  A justice of the Superior Court granted summary judgment in all three actions in favor of the various defendants on the grounds that Dauray lacked standing to bring the claims pursuant to G.L. 1956 § 33-18-17 or under the common law.  The trial justice determined that Dauray was not "a person legally interested in the estate" of Gabrielle because, in her deposition testimony, Dauray expressly disavowed any recovery in these actions, and also because the instruments at issue clearly directed that all of the couple's assets were to go to charity, thus depriving Dauray of any potential pecuniary interest.  Additionally, Dauray alleges that the trial justice erred when he awarded attorneys' fees to the defendants when Dauray sought to amend her reasons of appeal from the probate court pursuant to G.L. 1956 § 33-23-1(a)(2).[6]  For the reasons set forth below, we affirm in part and reverse in part the judgments of the Superior Court.

## Facts and Travel

A review of the record in each case, including deposition testimony submitted at summary judgment, reveals the following facts.  Gabrielle and Timothy Mee (Timothy) were

---

[3] Appeal No. 2013-136-A.

[4] BOA is a party as successor-in-interest by merger or otherwise to Fleet National Bank (Fleet). The Court will not distinguish between BOA or Fleet, but instead will refer to either entity as BOA throughout the opinion.

[5] Appeal No. 2013-137-A.

[6] The parties, and the Superior Court, incorrectly referred to the statute as G.L. 1956 § 33-23-1(2).

devout Roman Catholics who made their life in Rhode Island. They married in 1950. They had no children.[7] Throughout their marriage, the couple prayed the rosary at night and faithfully attended Mass. During their lifetime, the Mees accumulated great wealth.[8]

On February 8, 1982, Timothy created a charitable remainder unitrust (CRUT), for the benefit of Timothy and Gabrielle during their lifetimes, and, after their death, for the benefit of charities. The original charitable beneficiary under the CRUT was The Hope Charitable Foundation, a nonprofit entity created by Timothy in 1967. Later that year, on September 30, 1982, Gabrielle created a trust indenture (the Gabrielle Mee Revocable Trust). Under its original terms, the Gabrielle Mee Revocable Trust was to terminate upon Gabrielle's death and pour over into The Hope Charitable Foundation, the same charitable beneficiary of the CRUT.

On January 29, 1985, Timothy established the Timothy J. Mee Foundation (the Foundation). The Foundation was "formed, and shall be exclusively administered and operated for charitable purposes." Significantly, "[n]either the income nor the assets of [the Foundation] shall ever inure to the benefit of the [s]ettlor or any other private person." In order to fund the Foundation, Gabrielle amended the Gabrielle Mee Revocable Trust on February 18, 1985. The amendment provided that all income that Gabrielle was entitled to receive as a lifetime beneficiary from the CRUT would be paid to the Gabrielle Mee Revocable Trust and, upon Gabrielle's death, the Gabrielle Mee Revocable Trust would terminate and all income and principal was to be paid to the Foundation. Finally, the Gabrielle Mee Revocable Trust was amended so that upon Timothy's death the Gabrielle Mee Revocable Trust would become irrevocable. The Gabrielle Mee Revocable Trust was amended once more, on May 3, 1985. As

_____

[7] Timothy had two children from a prior marriage. Tragically, his first wife and two children were killed by the Great Hurricane in September 1938.

[8] Timothy was a shareholder and director of Fleet National Bank.

part of this amendment, the Gabrielle Mee Revocable Trust was to pay the remainder of the trust assets to the Foundation, unless Gabrielle had previously exercised her power of appointment. Timothy passed away later that year, on December 18, 1985. Gabrielle lived for another twenty-two years.

On October 22, 1987, Gabrielle created another charitable trust, known as the Gabrielle D. Mee Trust. The Gabrielle D. Mee Trust was to pay income to the Contemplatives of Our Lady of Joy, Inc. (the Contemplatives). The Contemplatives, at the time, were a small religious order—founded by two brothers from Rhode Island—with only preliminary recognition from the Roman Catholic Church. The Gabrielle D. Mee Trust provided that the "trustees may terminate the [t]rust for any reason at any time that [the Contemplatives] has not been officially recognized by the Roman Catholic Church, or otherwise approved by the trustees in their sole and absolute discretion[.]" Gabrielle permitted the Contemplatives to live—rent-free—at her property in North Smithfield.

In or about August 1989, Gabrielle first learned of the Legion of Christ from a fellow parishioner.[9] Thereafter, Gabrielle visited the Legion of Christ at their center in Cheshire, Connecticut, to learn more about them. The Legion of Christ was established in Mexico by Father Marcial Maciel Degollado (Father Maciel), who served as the General Director of the Legion of Christ until 2005. After learning more about the Legion of Christ, either personally or through trust officers who researched the organization at her behest, Gabrielle made a million-dollar donation to the Legion of Christ. Gabrielle stated that after this discovery she "caught

---

[9] Although Gabrielle maintained that she first learned of the Legion of Christ from a fellow parishioner, a trust officer contended that he informed Gabrielle about the Legion of Christ. This discrepancy is of no consequence to this opinion.

fire" and "knew that [the Legion of Christ] was the way to go"—presumably with her charitable donations, and later with a vocation lasting for the remainder of her life.

On October 10, 1991, Gabrielle executed a will that revoked all prior wills and codicils (1991 Will). Importantly, the 1991 Will directed that 10 percent of the Gabrielle Mee Revocable Trust was to benefit Americans United for Life (AUL) and 90 percent was to go to the Legion of Christ. The residue of her estate was devised "to the trustee then serving under the [Gabrielle Mee Revocable] Trust."

Later that year, in November 1991, Gabrielle became a consecrated woman with the Regnum Christi, an organization associated with the Legion of Christ. In order for Gabrielle to become a consecrated woman, however, certain qualifying prerequisites, including educational requirements and the "typical" path that consecrated women go through, were waived by Father Maciel.[10] Another condition of becoming a consecrated woman of the Regnum Christi was that members were expected to donate half of their assets to the organization after fifteen years and all of their assets after twenty-five years. Gabrielle began residing at the Regnum Christi facility in Wakefield, Rhode Island, at this time.[11] On November 23, 1991, Father Maciel wrote to Gabrielle and encouraged Gabrielle to submit a monthly budget to priests of the Legion of Christ in order to fulfill her promise of poverty as a consecrated woman.

---

[10] The Statutes of the Regnum Christi Movement stated that consecrated women "typically follow the following path:" (1) one year of formation; and (2) three to four years of study of "spirituality, general culture, pedagogy, philosophy, theology, writing and public speaking and other subjects that are useful for the apostolate * * *."

[11] Eventually, Gabrielle relocated to her former North Smithfield property, which she transferred to the Legion of Christ, along with other consecrated women. She lived there during her remaining years.

During her time at Regnum Christi, Gabrielle considered herself the grandmother of the younger consecrated women.[12] Gabrielle believed that Father Maciel was a saintly man, and she relied upon other Legion of Christ priests to be her spiritual advisers. In September 1995, Gabrielle authored a short account of her journey toward becoming a consecrated woman, in which she expressed great delight at all the Regnum Christi had given her spiritually. However, the record before us also discloses that, when family members visited Gabrielle, the visits were monitored to some extent by other Regnum Christi members. When one friend attempted to contact Gabrielle, she was told on multiple occasions that Gabrielle was either indisposed or not feeling well. Furthermore, Gabrielle was denied a request she made to a "tribunal" for permission to visit family members out of state.

On January 11, 1994, Gabrielle amended the Gabrielle D. Mee Trust by substituting the Legion of Christ as the beneficiary, to the exclusion of the Contemplatives. This occurred after Gabrielle learned that a male member of the Contemplatives had been accused of soliciting sex from another male. Gabrielle withdrew support of the Contemplatives and evicted them from the North Smithfield property. Around this time, Gabrielle deeded the North Smithfield property to the Legion of Christ.

On September 2, 1994, the Foundation was amended and renamed The Timothy J. Mee Charitable Trust. The amendment provided that the trust was to "support exclusively the Legion of Christ * * *. However, should the said Legion [of Christ] ever cease to be an organization exempt from taxation under §501(c)(3) of the [Internal Revenue] Code or cease to be faithful to the Holy Father as determined by the Roman Pontiff or his designee, then the [t]rust shall be a

---

[12] In describing her life at the Regnum Christi, Gabrielle stated: "I enjoyed the life very much. * * * It was everything I wanted. It was most fulfilling. And the nice part is, here I was at 80 [years old] and surrounded with such a young family. So I became the grandmother officially. I had some beautiful, very wonderful grandchildren. All kindred souls."

- 6 -

supporting organization of Overbrook, Inc. of Rhode Island * * *." The same conditions were imposed on Overbrook, Inc., such that if it ever ceased to be an I.R.C. § 501(c)(3) (2012) organization or faithful to the Holy Father then the trust would benefit Hombre Nuevo Rhode Island, Inc. Again the same conditions were imposed on Hombre Nuevo Rhode Island, Inc. and the next organization was Mater Ecclesiae, Inc., and thereafter, the last alternative beneficiary, The Papal Foundation, all with the same conditions. Finally, if The Papal Foundation ceased to be a § 501(c)(3) organization or faithful to the Pope, the trust was to support "such entity or entities that are tax-exempt under §501(c)(3) of the code as the [t]rustee shall in its sole discretion determine, provided, that the [t]rust shall not support any entity or activity which is opposed to the teachings or doctrine of the Roman Catholic Church." All the named beneficiaries, with the exception of The Papal Foundation, were entities related or associated with the Legion of Christ. Additionally, the amendment established an advisory committee "composed of three persons appointed by the President of the Legion of Christ," designed to make recommendations regarding trust distributions, which recommendations the trustee was to consider when making distributions. Finally, the amendments provided that no further amendments could be adopted without the consent of Gabrielle or, if Gabrielle was deceased, the advisory committee. These amendments allegedly were drafted by Father Anthony Bannon of the Legion of Christ, at the request of Gabrielle, and were adopted by BOA as trustee.

On January 6, 1995, Gabrielle executed a codicil to her 1991 Will, in which she bequeathed 100 percent of the Gabrielle Mee Revocable Trust to the Legion of Christ. Effectively, the codicil excluded AUL from her will and combined their 10 percent bequest with the Legion of Christ's 90 percent bequest. The residuary clause of the 1991 Will was not affected by this codicil.

The Legion of Christ purchased a former IBM training complex in Westchester County, New York, known as "Thornwood," in the fall of 1996. The purchase price for this property was $35 million. The Legion of Christ was able to purchase Thornwood thanks in part to a $25 million loan and a $5 million revolving line of credit from BOA. When extending the loan and line of credit, a BOA officer relied on representations by the Legion of Christ that repayments would come from Gabrielle and the various trusts. In fact, beginning in January 1997, Gabrielle directed that income generated by the CRUT be directed to the Legion of Christ, rather than the Gabrielle Mee Revocable Trust. This income represented approximately 50 percent of the debt service for the mortgage loan.

On February 23, 1997, The Hartford Courant published an article detailing scandals within the Legion of Christ, particularly concerning conduct by Father Maciel. According to the article, nine men had accused Father Maciel of sexually abusing them between the 1940s and 1960s. The victims also alleged that Father Maciel molested upwards of thirty boys during the same time period. The article also stated that Father Maciel was previously investigated—although cleared of any wrongdoing at the time—for abusing drugs, misusing money, and engaging in other improprieties. It is unclear whether the Regnum Christi members were informed of these allegations and, if so, to what extent. What is clear is that Father Bannon apologized to BOA for not notifying it of the accusations before the report was published. The record is silent as to whether Gabrielle was personally notified of the accusations by Father Bannon or BOA.

On March 18, 1999, Gabrielle executed yet another codicil to her 1991 Will. This codicil provided that her executor was only to invest in:

> "companies, the products, activities and business practices of
> which are consistent with Catholic moral teaching and in

- 8 -

accordance with the investment guidelines of the Legion of Christ, Inc. * * * I direct that no assets of my estate be invested in companies in the liquor industry, health care or pharmaceutical companies that perform abortions or develop artificial contraceptives, or companies in the entertainment industry that produce pornographic material or otherwise attack or contradict the moral principles of the Catholic church."

The Gabrielle D. Mee Trust and The Timothy J. Mee Charitable Trust were amended on the same day and in like manner.

On December 14, 2000, Gabrielle executed a new will (2000 Will). The 2000 Will exercised her power of appointment over the Gabrielle Mee Revocable Trust in favor of the Legion of Christ and also left the residue of her estate to the Legion of Christ. The investment restrictions that were the subject of the 1999 codicil also were incorporated. The major distinctions between the 1991 Will (and codicils executed thereafter) and the 2000 Will were that the residuary beneficiary was changed from the Gabrielle Mee Revocable Trust to the Legion of Christ and that the 2000 Will appointed Father Bannon as executor of the estate rather than BOA. However, BOA remained as an alternate executor. Father Bannon had previously been granted a durable power of attorney, authorizing him to represent Gabrielle in any discussions with BOA regarding the various trusts.

In December 2000, the Legion of Christ requested that BOA terminate the Gabrielle D. Mee Trust and distribute its res to The Timothy J. Mee Charitable Trust—of which the Legion of Christ was the sole beneficiary—in order to discharge its mortgage debt. In March 2001, before BOA could respond, Gabrielle and the Legion of Christ brought an action in the Superior Court, alleging that BOA breached its duty of loyalty by making the 1996 loans instead of taking principal out of the two trusts to fund the purchase of Thornwood. In the midst of the litigation, Gabrielle executed a codicil to her 2000 Will on September 20, 2002. The codicil revoked

BOA's status as an alternate executor and named a Legion of Christ priest as the new alternate executor.[13]  In August 2003, the parties reached a settlement that was approved by the Superior Court and the Attorney General, Division of Charitable Trusts.  As part of the settlement, the Gabrielle D. Mee Trust was liquidated and The Timothy J. Mee Charitable Trust was amended and restated, such that it was due to terminate on December 31, 2042.  Additionally, as part of the settlement, Gabrielle released BOA from any and all claims which were or which could have been brought before August 26, 2003.

On May 19, 2006, an official "Communiqué Concerning Founder of Legionaries of Christ" was issued by the press office of Pope Benedict XVI.  The Communiqué publicized that misconduct allegations were lodged against Father Maciel beginning in 1998 and that, in 2001, then-Cardinal Joseph Ratzinger had authorized an investigation.  Father Maciel retired from the Legion of Christ in 2005 after he was "invite[d] * * * to a reserved life of penitence and prayer, relinquishing any form of public ministry."  The Communiqué acknowledged the worthiness of the Legion of Christ despite Father Maciel's transgressions.  Father Maciel died on January 30, 2008.

Beginning in late 2006, Gabrielle directed a number of gifts to the Legion of Christ.  In September 2006, she instructed BOA to distribute an additional $3,000 a month from her trust to the Legion of Christ.  In December 2006, she made a $1,210,000 gift to the Legion of Christ from her personal account.  In August 2007, she again made a $590,000 gift from her personal account to the Legion of Christ.  On May 12, 2008, Father Bannon requested that BOA transfer $400,000 from Gabrielle's personal account to the Legion of Christ.  The transfer was made on

---

[13] The codicil instructed the executor to continue the litigation until it was completed by substituting the estate as plaintiff should Gabrielle die before it was resolved.

May 14, 2008.  On May 16, 2008, after more than sixteen years living as a consecrated woman at the Regnum Christi facilities, Gabrielle passed away.

Two years later, on May 1, 2010, Pope Benedict XVI issued yet another Communiqué declaring that there existed "very grave and objectively immoral actions of Father Maciel, confirmed by incontrovertible testimonies, [that] in some cases constitute real crimes and manifest a life devoid of scruples and authentic religious meaning."  The Communiqué acknowledged that the Legion of Christ would have to undergo "a process of profound re-evaluation."  Nonetheless, Pope Benedict XVI, through the Communiqué, reaffirmed his support of the Legion of Christ.

As the named executor, Father Bannon filed a petition for probate of the 2000 Will in the Smithfield Probate Court on March 6, 2009.  Dauray, as an heir-at-law, contested his appointment and challenged the validity of the will.  By stipulation of the parties, the will and codicil thereto were admitted to probate on February 4, 2010.  On February 24, 2010, Dauray filed an appeal in the Superior Court.  In December 2010, Dauray was deposed and asked for the basis of her challenge to the validity of the will.  When asked about fraud as a basis for the challenge, Dauray testified that she wished "to take back the word fraud."  However, on May 11, 2011, Dauray moved to amend her reasons of appeal of the probate court to include allegations of fraud, deceit, and mistake by inducement.  In a bench decision, the trial justice granted the motion to amend but did so by conditioning the filing of the amendment on the payment of "all legal fees and costs incurred * * * in connection with the preparation for and the taking of the deposition, and the preparation for and the hearing on the motion[.]"  On November 17, 2011, the Superior Court justice entered an order directing Dauray to pay a total of $24,418 in legal

fees as a condition of the amendment. Dauray filed a motion requesting the court to vacate or reconsider the order, which was denied.

In May 2011, Dauray filed two additional lawsuits: one against the Legion of Christ seeking to recover gifts made by Gabrielle to the Legion of Christ during her lifetime; and the second against BOA, alleging a breach of fiduciary duties that BOA, as trustee, owed Gabrielle. The three cases were consolidated for the purposes of discovery. During her deposition and in her filings with the court, Dauray consistently declared that she was not seeking to recover any of Gabrielle's assets for herself, but rather, wanted to ensure that the assets were distributed according to her aunt's intentions.

Summary judgment motions on all three cases[14] were heard together in August 2012. The trial justice issued a written decision on September 7, 2012, granting summary judgment in favor of all defendants on the grounds that Dauray lacked standing to bring the actions. Final judgment entered in all three cases on June 24, 2013. Dauray timely appealed.

**Standard of Review**

"[T]his Court reviews a grant of summary judgment de novo." Sullo v. Greenberg, 68 A.3d 404, 406 (R.I. 2013) (quoting Sacco v. Cranston School Department, 53 A.3d 147, 149-50 (R.I. 2012)). "Although summary judgment is recognized as an extreme remedy, * * * to avoid summary judgment the burden is on the nonmoving party to produce competent evidence that 'prove[s] the existence of a disputed issue of material fact[.]'" Id. at 407 (quoting Mutual Development Corp. v. Ward Fisher & Co., 47 A.3d 319, 323 (R.I. 2012)). "Only when a review of the admissible evidence viewed in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law,

---

[14] The motions in the lifetime gifts and trust case were originally filed as motions to dismiss, but the trial justice converted them to motions for summary judgment.

- 12 -

will this Court uphold the trial justice's grant of summary judgment." Sola v. Leighton, 45 A.3d 502, 506 (R.I. 2012) (quoting National Refrigeration, Inc. v. Standen Contracting Co., 942 A.2d 968, 971 (R.I. 2008)).

"To determine whether a plaintiff has standing to sue, the court must focus 'on the party who is advancing the claim rather than on the issue the party seeks to have adjudicated.'" N&M Properties, LLC v. Town of West Warwick, 964 A.2d 1141, 1145 (R.I. 2009) (quoting Bowen v. Mollis, 945 A.2d 314, 317 (R.I. 2008)). "The standing inquiry is satisfied when a plaintiff has suffered 'some injury in fact, economic or otherwise.'" Id. (quoting Bowen, 945 A.2d at 317). "We have defined injury in fact as 'an invasion of a legally protected interest which is (a) concrete and particularized * * * and (b) actual or imminent, not conjectural or hypothetical.'" Id. (quoting Pontbriand v. Sundlun, 699 A.2d 856, 862 (R.I. 1997)).

**Analysis**

**Standing as a Result of Intestacy**

On appeal, Dauray contends that the trial justice erred in determining that she did not have standing to contest the 2000 Will as the product of undue influence and fraud. The plaintiff argues that standing results from G.L. 1956 § 33-1-1, which provides that, when a person dies intestate with no surviving descendants, parents or siblings, the estate passes in equal portions to the descendants of the deceased's siblings—the nieces and nephews of the intestate. It is undisputed that Dauray is Gabrielle's next of kin; and, if intestacy were to result, Dauray would inherit from Gabrielle's estate. Dauray asserts that the mere possibility that she may inherit through intestacy is sufficient to grant her standing to challenge the validity of the will.

Dauray argues that, in construing the facts in the light most favorable to her as the nonmoving party, as is required at summary judgment, the 2000 Will will be invalidated. Thus,

Dauray asserts that the 1991 Will controls the administration of Gabrielle's estate. However, she argues that only a portion of that will is valid. According to Dauray, the 10 percent bequest to AUL of the 1991 Will is valid and enforceable, but the 90 percent bequest to the Legion of Christ fails because, she alleges, that bequest also was obtained by undue influence and fraud. Therefore, Dauray asserts that the 90 percent bequest would fall into the residuary clause. See Smith v. Ahearn, 52 R.I. 346, 348, 161 A. 117, 118 (1932) (holding that a void bequest passes to the residue of the estate). According to Dauray, "the Legion [of Christ] was also named the residuary beneficiary of [Gabrielle's] 1991 will. In Rhode Island, where the residuary clause of a will fails, the estate must pass by the laws of intestacy." Under this scenario, Dauray asserts that partial intestacy would result, and thus, as an heir-at-law, she has standing to challenge the validity of the will.

Conversely, the Legion of Christ argues that Dauray has no standing to challenge the validity of the will because she has not suffered any injury in fact. The Legion of Christ cites to Dauray's own statements—which the Superior Court relied upon—that she disavowed any personal interest in Gabrielle's estate, but rather, wanted to assure that Gabrielle's estate goes to charities that were consistent with Gabrielle's desires.[15]

However, were this Court to adopt Dauray's premise on standing—that the 1991 Will controls the distribution of her estate due to undue influence and fraud—Dauray still lacks standing to pursue this action because there simply is no legitimate path to partial intestacy. As Dauray argues, the invalidity of a will procured as a result of undue influence does not revoke a prior will that properly was executed. See Reese v. Court of Probate of Newport, 9 R.I. 434, 435

---

[15] Because we conclude that Dauray does not have standing without reaching the issue of her purported "disavowal," we decline to address that portion of the trial justice's decision. Additionally, we decline to address the issue of cy pres for the same reason.

- 14 -

(1870); see also 25 A.L.R.2d 657 (1952). Accordingly, as Dauray asserts, if the 2000 Will were invalidated, the 1991 Will would control. Further, if, as Dauray contends, the 90 percent bequest to the Legion of Christ was invalid due to undue influence or fraud, then that bequest would pass to the residuary beneficiary. See Smith, 52 R.I. at 348, 161 A. at 118; Todd v. St. Mary's Church, Portsmouth, R.I., 45 R.I. 282, 285, 120 A. 577, 578 (1923). However, Dauray's characterization of the residuary clause of the 1991 Will is incorrect. The residuary clause does not name the Legion of Christ as the beneficiary—as Dauray submits—but rather, the 1991 Will states: "I give all the residue of my estate * * * to the trustee then serving under the [Gabrielle Mee Revocable] Trust." Thus, the residuary clause of the 1991 Will would not lapse, and it would be impossible for intestacy to occur.[16]

At the time of Gabrielle's death, the Gabrielle Mee Revocable Trust was to terminate and pour over into the Foundation, which was later renamed The Timothy J. Mee Charitable Trust— assuming any assets remained after Gabrielle exercised her power of appointment. The Timothy J. Mee Charitable Trust has a number of potential Legion of Christ-related beneficiaries, but should they all fail, then the trust was to benefit The Papal Foundation, and if not The Papal Foundation, then an organization determined by the trustee. Thus, even if the Legion of Christ procured its bequests by exerting undue influence over Gabrielle, Dauray still has no possibility of inheriting because The Papal Foundation would take as an alternate beneficiary of The Timothy J. Mee Charitable Trust. See In re Estate of Lewis, 411 So.2d 368, 370-71 (Fla. Dist.

---

[16] Of note, although perhaps irrelevant to the current standing analysis, is that at the time the 1991 Will was first executed, the residue was to go to the Gabrielle Mee Revocable Trust and then to the Foundation. The Foundation, at this time, was "exclusively administered and operated for charitable purposes" and did not name any specific beneficiaries. It was not until 1994 that the Gabrielle Mee Revocable Trust and the Foundation were amended to benefit the Legion of Christ. Thus, at the time of the execution of the 1991 Will, the residuary clause would inure to the benefit of "charitable purposes" through administration of the Foundation.

Ct. App. 1982) ("The basic question to be answered is: Will the widow derive some pecuniary or other beneficial interest if she successfully contests and avoids the other devise? If she <u>will</u> benefit she has standing, and if she <u>will not</u>, then she has none."); In re Estate of Prynn, 315 A.2d 265, 267 (Pa. 1974) ("If any specific bequest in the 1970 will were found invalid, nothing would prevent it from passing by the residuary clause. Accordingly, the heirs could in no circumstances benefit from the invalidity of any bequest provided by the 1970 will. Since the heirs cannot benefit, they have no standing to object.").

Our careful examination of the record before us demonstrates that the assets from the Gabrielle Mee Revocable Trust would pour over to The Timothy J. Mee Charitable Trust, and BOA, the trustees in 1991, would make distributions in accordance with the trust instruments. The terms of the trust provided for a series of alternative beneficiaries, including The Papal Foundation, which was not a Legion of Christ-related entity. Additionally, according to the terms of the trust, "[n]either the income nor the assets of [The Timothy J. Mee Charitable] Trust shall ever inure to the benefit of the [s]ettlor <u>or any other private person</u>." (Emphasis added.) Accordingly, because there was a valid and enforceable residuary clause, there was never a possibility that intestacy would result, even if the allegations of undue influence and fraud were proven.

Dauray points to our opinion in Spooner v. Tucker, 86 R.I. 266, 134 A.2d 403 (1957) as support for her contention that she need only show that, should intestacy result from a will contest, she would take as an heir-at-law, not the likelihood that intestacy would result. We note that Spooner concerned an appeal by the heirs-at-law from the denial of a motion to intervene in the action, in which this Court addressed the issue of standing. We stated:

> "This is not to say, however, that where a motion is made
> to dismiss an appeal for want of [standing] on the ground the

prospective appellant is not a 'person aggrieved' within the meaning of the statute, he will not be required to prove the [standing] allegations, that is, the truth of the allegations of the circumstances upon which he relies in claiming to be a 'person aggrieved.'" Id. at 271-72, 134 A.2d at 406.

In the case before us, Dauray asserts that she is an interested party as a result of a lapsed residuary clause in the 1991 Will. However, she makes this argument by mischaracterizing the actual residuary bequest. Thus, even if the bequest to the Legion of Christ in the 1991 Will were to fail, the residuary clause of the 1991 Will provides that any lapsed gift be directed to the Gabrielle Mee Revocable Trust. Because there is no possibility that Dauray would take, she cannot be a person aggrieved.

The rule adopted by Spooner, and later applied in Apollonio v. Kenyon, 101 R.I. 578, 586-87, 225 A.2d 778, 783 (1967), that an heir-at-law seeking to challenge a will need only prove that he or she would be eligible to inherit should intestacy result, does not, by itself, confer standing if it can be shown that a probate appellant has no interest in the estate. Once it becomes obvious that there no longer exists a justiciable question by a person with a stake in the outcome, the litigation may not continue. Such a situation was considered by this Court in Insana v. Rhode Island Hospital Trust Co., 110 R.I. 476, 294 A.2d 181 (1972). In Insana, the heirs-at-law sought to intervene in the same manner as the heirs-at-law in Spooner. The Court stated that:

> "the Superior Court must first determine upon motion that '[w]here a person seeks to be added as a party appellant when a[] [probate] appeal is pending and thereby seeks to become a party to that [probate] appeal, he must establish that he has an interest in the estate and that he is aggrieved by the decree. The burden of showing this is on the [party seeking to intervene].'" Insana, 110 R.I at 477, 294 A.2d at 182 (quoting Spooner, 86 R.I. at 273, 134 A.2d at 407 (emphasis added)).

This Court declared that "[t]he purported intervenors have not * * * even alleged that they have the status of interested parties, which is necessary to bring them before the Superior Court." Id.

- 17 -

(emphasis added).   In these circumstances, Dauray has failed to produce evidence demonstrating that the residuary clause of the 1991 Will would lapse resulting in distribution under the laws of intestacy.  Accordingly, Dauray has not suffered an injury in fact and there no longer remains "a justiciable question as to [her] right to share in the deceased's estate." Apollonio, 101 R.I. at 587, 225 A.2d at 783.

Our brief survey of other jurisdictions supports this reasoning as the generally accepted manner to determine standing in a will contest. See Annot. 64 A.L.R.3d 261, § 2(a) (1975) ("It has been held in a number of cases that the residuary clause of the will involved therein would not be invalidated by undue influence exerted as to some other portion of the instrument, such determination often being made in the course of the court's holding that heirs[-]at[-]law had no standing to challenge any portion of the will other than the residuary clause if the latter was assumed to be valid." (emphasis added)).

In Batt v. Vittum, 30 N.E.2d 394 (Mass. 1940), the appellant and heir-at-law of the testatrix challenged the validity of a will that contained four numbered paragraphs.  Paragraphs one and two of the will were bequests to an educational institution.  Paragraph three of the will was a residuary clause that provided: "[a]ll the rest, residue, and remainder of my estate, of whatever nature or sort, and wherever the same may be situated * * * I give, devise, and bequeath to my dear friend, Miss. A. Laura Batt." Id. at 395.  The residual legatee under paragraph three was named the executor in paragraph four.  When the will was presented for probate, lines had been drawn through paragraphs one and two in their entirety and through the words "the rest, residue, and remainder of" in paragraph three.  The appellant argued that paragraphs one and two of the will had been revoked.  However, the court determined that the appellant had

"no standing to make this contention unless the effect of paragraph numbered [three] as a residuary clause has been destroyed. If its effect as such a clause ha[d] not been destroyed the appellant as an heir-at-law and next of kin of the deceased w[ould] take nothing from her estate whether or not paragraphs numbered [one] and [two] have been revoked." Id. at 395 (emphasis added).

Similarly, in In re Carothers' Estate, 150 A. 585 (Pa. 1930), the appellant—who was an heir-at-law of the deceased—challenged a certain specific legacy as procured by undue influence. The will included several such legacies, including a bequest to the appellant, and also a residuary clause that left the residue to a nursing home. Id. at 585. The court determined that, even if the appellant was successful in striking down the specific bequests, she would receive nothing because she was not a residuary legatee. Id. at 586. Thus, the court concluded that:

"[w]here the contestant to a will which is void in part receives no benefit from the contest, he is not entitled either to sustain a caveat or to take an appeal from the action of the court below; therefore he has no interest in the distribution. * * * A party who has no interest in the distribution is not a 'person aggrieved,' and cannot take an appeal under this act." Id.

Moreover, in In re Estate of Molera, 100 Cal. Rptr. 696 (Cal. Ct. App. 1972), the appellant, who was an heir-at-law of the deceased, sought to invalidate certain bequests that were made to the son and daughter of the attorney who had drafted the will of the deceased as procured by undue influence. The will at issue included a residuary clause that named four hospitals as the residuary beneficiaries. Observing that there existed valid residuary legatees that would take if the devises to the attorney's children were deemed void, the court stated: "[a]ppellants as heirs under the intestacy laws would not * * * be entitled to any part of such lapsed or void devise." Id. at 702. The court concluded that "appellants have not shown that they have a direct contingent pecuniary interest in the devolution of the testatrix's estate * * *." Id.; see also In re Land's Estate, 137 P. 246, 248 (Cal. 1913) ("[O]rdinarily a petition showing that

- 19 -

the contestant is an heir[-]at[-]law of the deceased sufficiently shows the requisite interest to contest a will. As we have seen, however, the heir[-]at[-]law may be without such right by reason of other facts.").

Our conclusion today also recognizes the long-standing presumption under our law that intestacy is disfavored, especially in the face of a valid residuary clause. See Industrial National Bank of Rhode Island v. Glocester Manton Free Public Library of Glocester, Rhode Island, 107 R.I. 161, 169, 265 A.2d 724, 728 (1970). In Glocester Manton, this Court held that "the avoidance of intestacy is favored, especially when the partial intestacy relates to the residuary estate. This is so because it is assumed that, when a person makes a will, he intends to dispose of his entire estate." Id. To avoid the possibility of intestacy in Glocester Manton, this Court concluded that a lapsed residuary bequest was to be distributed among the remaining residuary beneficiaries, as opposed to the heirs-at-law of the testatrix, even though the remaining residual legatees were not within the purview of the contemplated statute that permitted such a distribution. Id. at 170-71, 265 A.2d at 729.

**Statutory Standing**

Dauray next claims that she has standing to bring claims on behalf of the estate to recover assets for the estate pursuant to § 33-18-17. Dauray argues that, as a person "legally interested in the estate of a deceased person," she may bring suit to challenge inter vivos gifts made by Gabrielle to the Legion of Christ that were procured by fraud and undue influence. Furthermore, Dauray contends that, because a claim for breach of fiduciary duty survives death, the claim is an asset of the estate that she has standing to recover.

The defendants argue that Dauray lacks standing in accordance with § 33-18-17 because under no circumstances would the property at issue benefit Dauray or the other heirs-at-law.

Rather, defendants argue that, if any of the property were to be recovered, it would go to a charity based upon Gabrielle's clear desires and intent—the same result, we note, that Dauray purportedly seeks to effectuate by bringing these claims. The defendants contend that Dauray is not a person legally interested in the estate because she has suffered no injury in fact, since there was never any possibility that she would inherit from Gabrielle's estate.

Section 33-18-17 provides:

> "If an administrator, executor, or guardian shall be requested by any person legally interested in the estate of a deceased person * * * to commence an action or proceeding to recover any property, personal or real, which the legally interested person may have reason to believe should be recovered for the benefit of the estate, and if the administrator, executor, or guardian shall * * * refuse, neglect or for any reason be incompetent, to commence the action or proceeding, the legally interested person may institute proceedings in the name of the estate of the deceased person, or person under guardianship, in the same manner and to the same extent as the administrator, executor, or guardian may do in the case of personal property, and in the case of real estate in the same manner as a guardian, devisee, or heir at law may do, to recover the property."

We are satisfied that § 33-18-17 does not vest Dauray with standing because she is not a "person legally interested in the estate." As discussed above, because there is no possibility of intestacy resulting, Dauray has no interest in her aunt's estate. See In re Estate of Molera, 100 Cal. Rptr. at 702; Batt, 30 N.E.2d at 395; In re Estate of Prynn, 315 A.2d at 267. Since Dauray does not have a legal interest in the estate, she cannot bring a claim pursuant to § 33-18-17.

Accordingly, we affirm the trial justice's decision as to plaintiff's lack of standing.

**Attorneys' Fees**

Dauray asserts that it was an abuse of discretion for the trial justice to impose attorneys' fees as a condition for Dauray to amend her reasons for appeal of the probate court decision. Dauray contends that the statute that the trial justice relied upon, § 33-23-1(a)(2), does not

provide statutory authority to impose attorneys' fees and that, by doing so, the trial justice ran afoul of this Court's pronouncements concerning our adherence to the traditional "American Rule"[17] with respect to imposition of attorneys' fees.

The defendants in the will contest action argue that the imposition of attorneys' fees by the trial justice was proper. Initially, defendants contend that § 33-23-1(a)(2) provides the requisite statutory authority for the imposition of attorneys' fees because the statute states: "unless, for cause shown, and with or without terms, the [S]uperior [C]ourt shall allow amendments and additions thereto." (Emphasis added.) According to defendants, an award of attorneys' fees falls within the scope of the phrase "with or without terms." The defendants also argue that the trial justice was acting within his sound discretion when he imposed fees in this instance, noting that the trial justice declared that the addition of a fraud claim "seem[ed] to fly in the face of testimony adduced from the appellant during the course of [her] deposition."

"The issue of whether there exists a basis for awarding attorneys' fees generally is legal in nature, and therefore our review of such a ruling is de novo." Blue Cross & Blue Shield of Rhode Island v. Najarian, 911 A.2d 706, 709 (R.I. 2006). "Only if it is determined that there is such a basis, then this Court will review a motion justice's actual award of attorneys' fees for an abuse of discretion." Id. (citing Kells v. Town of Lincoln, 874 A.2d 204, 214 (R.I. 2005)).

Initially, we are skeptical that § 33-23-1(a)(2) provides the requisite statutory authority to impose attorneys' fees. The defendants' contention—and by extension the trial justice's determination—that the phrase "with or without terms" encompasses attorneys' fees is debatable. In Waldeck v. Piner, 488 A.2d 1218, 1220 (R.I. 1985), we declared that attorneys' fees were not

---

[17] The "American Rule" provides that, apart from some exceptions, litigants bear their own attorneys' fees and costs absent contractual liability or statutory authority. See Moore v. Ballard, 914 A.2d 487, 489 (R.I. 2007).

- 22 -

contemplated by the term "costs" and that "[a]bsent express statutory authority, counsel fees are not awardable as part of the costs of litigation." However, for purposes of the present appeal, we will assume, and not decide, that § 33-23-1(a)(2) supplies the requisite statutory authority for the award of attorneys' fees. We nevertheless conclude that the trial justice abused his discretion in ordering that Dauray pay attorneys' fees for "all reasonable legal fees and costs incurred by the [defendants] in connection with the preparation for and the taking of the [plaintiff's] deposition, and the preparation for and the hearing on the [m]otion to [a]mend[.]" At the time the fees were awarded, plaintiff had been deposed by defendants.

By motion to the trial justice, Dauray sought to add fraud as a basis of appeal from the probate court. The defendants argued before the Superior Court justice that they would be prejudiced by this amendment because it "would require the taking of further discovery and may require the retaking of [plaintiff's] deposition." However, the fee award by the trial justice was entirely retrospective, requiring Dauray to pay for depositions that already had taken place. If the award were to be applied prospectively—that is for any costs that would be incurred as a result of the amendment, such as a future deposition of Dauray regarding fraud as a basis for appeal—then it may have been an exercise of the trial justice's sound discretion. As this Court has held:

> "discretion is not exercised by merely granting or denying a party's request. The term 'discretion' imports action taken in the light of reason as applied to all the facts and with a view to the rights of all the parties to the action while having regard for what is right and equitable under the circumstances and the law." Hartman v. Carter, 121 R.I. 1, 4-5, 393 A.2d 1102, 1105 (1978).

It is our considered opinion that the imposition of retrospective attorneys' fees, in this case, does not comport to what is "right and equitable under the circumstances and the law." Id. at 5, 393

A.2d at 1105. Therefore, we vacate the decision of the trial justice requiring the plaintiff to pay attorneys' fees in order to amend her reasons for appeal of the probate court decision.

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court in part and vacate in part. We affirm the judgment granting summary judgment to the defendants and vacate that portion of the judgment awarding attorneys' fees to the defendants.

Justice Flaherty did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       Mary Lou Dauray v. Gabrielle D. Mee (a/k/a Gabrielle Malvina Mee).

Mary Lou Dauray, as heir-at-law of Gabrielle D. Mee, and on behalf of the Estate of Gabrielle D. Mee v. Legion of Christ et al.

Mary Lou Dauray, as heir-at-law of Gabrielle D. Mee, and on behalf of the Estate of Gabrielle D. Mee v. Bank of America et al.

**CASE NO:**        No. 2013-135-Appeal.
(PB 10-1195)

No. 2013-136-Appeal.
(PC 11-2640)

No. 2013-137-Appeal.
(PC 11-2757)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   February 6, 2015

**JUSTICES:**       Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Bernard A. Jackvony, Esq.

For Defendants:  Joseph J. McGair, Esq.
Joseph Avanzato, Esq.
Steven E. Snow, Esq.